GREENBERRY DORSEY, COMPLAINANT AND APPELLANT, v. SAMUEL PACKWOOD.

An agreement, whereby the purchaser of a plantation "bound himself to transfer to his son-in-law one half of the plantation, slaves, cattle, and stock, as soon as the son-in-law should pay for one half of the cost of said property, either with his own private means, or with one half of the profits of the plantation," was deficient in mutuality. The son-in-law was not bound to render any services nor pay any money. It was a *nude pact.*

It was not an alternative obligation upon the son-in-law, because the election to pay his half out of the profits would have been merely paying with another man's money.

Even if the agreement possessed mutuality, there was no performance, or offer of performance by the son-in-law for twenty-seven years.

Moreover, fifteen years after the agreement, when the plantation was likely to prove a ruinous purchase, the son-in-law abandoned and released all his claim.

THIS was an appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

The leading facts in the case are stated in the opinion of the court, to which the reader is referred.

Upon the hearing in the Circuit Court, the bill was dismissed, and Dorsey appealed to this court.

It was argued by *Mr. Henderson* for the appellant, and *Mr. Butler* for the appellee.

*Mr. Henderson*, for the appellant, filed an elaborate argument,

consisting of upwards of one hundred pages, in which he examined the grounds upon which Dorsey's claim was resisted.

He said, our claim is chiefly resisted on three grounds.

1. That the agreement is void for want of valuable cause or consideration.

2. If ever valid, the right has been abandoned by complainant.

3. If ever valid, the right has been legally released by complainant.

Other objections are interposed to our recovery by the defendant, and some of them as if they separately constituted distinct bars to our suit; but, on examination, it will be seen that, beside the three grounds of defence above specified, among the other objections, one only has any plausible claim of being separately considered a bar to the action, viz., Dorsey's intervening bankruptcy. We think, however, this point of bankruptcy is easily answered, if we succeed in overcoming the first three objections.

We admit, too, that, to maintain our action, the agreement of 16th April, 1821, must appear to have been made for a valuable consideration, and we must also overcome the defendant's pleas of abandonment and release.

First, then, as to the consideration for said agreement. The agreement being signed by both parties, binds each equally to the terms, conditions, and stipulations imposed on each, and confers the rights either has conceded to the other. We admit Dorsey's rights are more clearly expressed in this contract than his duties; but it is plain enough that Dorsey accepts the obligation Packwood has incurred, to convey to him, on the terms expressed, one half of the property mentioned. And it is as plain in sense and meaning, though not as explicit in expression, that Dorsey does undertake to pay for one half the cost of said property, in one of two ways, viz., either from his " own private means, or with the one half of the profits of the plantation." Under the first alternative, it is obvious he might have paid up one half in advance of the payments due to Lafarge, though the duty would have been fairly performed by meeting those payments as they became due, or by paying up the half due after the profits had paid part.

But the alternative in the agreement was at Dorsey's election, 1 Poth. Ob. p. 284, § 3; Old Code La. p. 276, art. 89, 90.

And it is the plain language of the contract, that Dorsey might " pay for one half the cost of said property . . . . . with the one half of the profits of the plantation." The evidence fully shows he elected this alternative, and the question now is,

how might he thus pay for one half? He could only do this by aiding to produce results and profits from the plantation, and by husbanding and appropriating their proceeds to this end. To do this was the consideration, the necessary consideration, pledged and promised, as resulting from this alternative of the agreement. Hence the consideration, we insist, appears on the face of the agreement. In the first alternative, to pay one half in money; in the second, in such services as would make the plantation pay one half from half its profits. And his rights, duty, and services, under this second alternative of the agree-ment, go hand in hand.

And there can be no doubt that, under any exigency which might have arisen, Dorsey could have been obliged by the courts to perform his part of the agreement, or to account in damages, or to have his contract cancelled. Just as certainly so as in any other case of contract for personal services.

But suppose it were the meaning of this agreement, as de-fendant's counsel has argued, that Dorsey might at any time have discharged himself from its obligations, by forfeiting all he had done or paid toward it; yet it is valid in this aspect as a lawful agreement as in any other; and most conclusively is, after it has been fully executed by Dorsey. 13 La. Rep. 249; 10 Rob. R. 369, 370; Code La. 1920, 1921; 11 Mart. 221; 4 N. S. 266; Jer. Eq. 435; 1 Madox, 376, 377; 1 Edwards, Ch. R. 1 to 7.

A consideration, then, is apparent on the face of the agree-ment, upon a fair interpretation of its terms by the court; and the evidence fully shows that the parties, too, have given it this construction, and the manner in which they have understood and executed it, shall bind them. On this rule, that the practi-cal construction of a contract by the parties shall govern, see Old Code La. p. 270, art. 56 to 64; New Code of 1825, art. 1051; 3 Rob. R. 187, 188; 10 Rob. 369, 370; 12 Rob. 170; Story's Eq. § 168; 3 Story's R. 263, 264, 269, 270, 271, 282, 285.

But, by the local law of Louisiana, not only is it unnecessary the consideration should appear in a written agreement, but in its absence a consideration is presumed. 12 Rob. R. 329; 5 La. 78.

Assuming, however, that the burden of proof is on Dorsey, to distinctly show consideration, yet, by the laws of Lousiana, the rule is clear, we may show consideration for the contract by parol. Old Code La. p. 264, art. 31, 32; Code of 1825, art. 1757, 1887, 1888, 1890, 1894, 1897.

Same rule, 1 Greenl. § 215. And acts done in execution of a contract may be proven by parol. 13 La. R. 264.

That we rendered the services on which we rely to show con-

sideration, is abundantly confessed by the defendant in his answer, though he assumes those services were gratuitous.

[The counsel then went into a minute examination of the answer and evidence, to show that Dorsey was expected to render, and did render, financial and other services of a personal nature in the concern and business of the plantation.]

With respect to the second proposition, viz., that Dorsey abandoned the concern by advising Packwood to sell and get out of the scrape, the counsel contended that the subsequent correspondence and transactions of Packwood showed that he did not so construe the letter at the time, but that such construction was an after-thought.

With respect to the third proposition, viz., the release, the counsel contended that it was given to Theodore, the son of Packwood, out of friendly feelings to him, and to promote his interest; and that as it affected the father, it was merely donative and void, because not an authentic act, and not accepted by Packwood.

At the date of this paper, Dorsey's rights under the agreement of 1821, had, according to complainant's calculation, become equitably consummate and complete. If the cost of the plantation had then been paid for from its profits, the condition of his purchase was accomplished. 13 La. 261; 1 Domat, p. 71, § 2, and p. 48, § 8.

In such aspect the right had become an equitable title — an informal title to property. 3 Mart. N. S. 337; 2 La. Rep. 460, 461; 3 La. 397; 13 La. 261.

From this time at least, if not from the beginning, Packwood held the title in trust, as to one half, for Dorsey. 1 Sch. and Lef. 214, 226, 227; 7 Mart. Rep. 244; 10 La. 420.

And courts of the United States uniformly distinguish legal from equitable titles in Louisiana, as elsewhere. 3 How. 512, 514, 515. It is especially so of a trust which results from fraud. 2 How. 650; 10 La. 420.

The contract to sell on a suspensive condition, when the condition is performed, becomes equivalent to a contract to sell without a condition. And the latter contract, in Louisiana, is a sale. Old Code, p. 346, art. 4, 9.

At common law, a release is known as a designated instrument of conveyance of a right in land; a deed, transmissive of title. 2 Black. Com. 324. It is also used at common law for remitting and discharging personal obligations. Used for either object it must be a deed, under seal, the seal importing a consideration, conclusive at law, except for fraud. If not under seal, though upon valuable consideration, it fails as an instrument to convey title to land. But if without seal, and

without consideration in fact, it is void, and no proof of purpose or intention can sustain it.

In the civil law system, the release is utterly unknown as a technical instrument of conveying or relinquishing a right or title in land. In this system, its more accurate name is remission; and its functions are exclusively limited to the remission of debts and personal obligations. C. C. arts. 2195, 2202.

Limited to these objects, it is regarded as the act of simple donation, and governed by the laws and rules of donation. 1 Poth. Ob. p. 310, 312.

The office of release and remission in the civil law does not even extend to the discharging of accounts between parties. Such acts are denominated "transactions," (C. C. art. 3038, 3050,) though governed by much the same rules as a release in like case at common law; inasmuch as renunciation thereby made, extends only to rights and claims actually settled. And as conclusive proof, that the doctrine of release and remission applies only to debts and personal obligations, the Civil Code requires " an act shall be passed before a notary-public and two witnesses of every doration *inter vivos* of immovable property, of slaves or incorporate things, such as rents, credits, rights, or actions, under the penalty of nullity." Art. 1523, 1525. A donation *inter vivos*, even of movable effects, will not be valid unless an act be passed of the same, as is before prescribed. Such an act ought to contain a detailed estimate of the effects given."

It being seen, then, that a release, in the civil law, is but a donation, it is obvious that if it applied to lands, slaves, and goods, which it does not, still, a donation of lands, slaves, or goods, or rents, must be executed before a notary, etc., or it is void. Hence, this instrument is null and void under the local law. And this is also shown by the manuscript record in this case (p. 340, 342) of Packwood *v.* Heirs of Alice Packwood, and the decisions of the Court there pronounced and decided; also, (9 Rob. R. 416,) that the right acquired to vest estate by an accepted bid at auction, is such a title as the purchaser could not relinquish by parol agreement, but a retrocession in writing must be made. Art. 2415, 2586. And Dorsey's rights, vested by agreement of 1821, could not require less than a like retrocession, with cause and description of property relinquished.

But though a release is not a designated instrument of conveyance at the civil law, we do not pretend but that an instrument resembling it in form of expression may be a conveyance under private signature, as per C. C. art. 2415.

In such case, however, it must have all the essentials of a sale, viz.: it must be for a price. C. C. art. 2414, 2439. And this price must be stipulated on agreement. Art. 1792, 1794, 2431, 2439.

Dorsey v. Packwood.

And such sale implies that the vendor, and not the vendee, was the owner. Art. 2418.

Now, the reverse of all these qualifications to a sale are either proved, or averred and admitted by the defendant in this case. As to ownership, for instance, defendant claims to have been sole owner since 18th January 1825. Ans. p. 58.

Of the legal title, as distinguished in equity, this is literally true, as he has held this from date of purchase in 1821. But defendant means the relinquishment of Dorsey's equitable contingent interest. Occupying such grounds, he cannot say the paper of 1836 was a sale. This paper has, therefore, no civil-law basis for validity, but is null *per se*. And viewed as a release, at common law and in equity, it is clearly null and void for want of a seal, or at all events for want of a consideration which a seal at common law implied. 13 Johns. R. 87; 7 Id. 169; 1 Cow. 122; 5 Watts & Serg. 486; C. C. art. 1887; 21 Pick. R. 101 . 2 Sumn. R. 11; 8 How. 158, 159.

And a release, like a receipt, is only held valid for the causes and matters computed on at the time. 1 Ed. Ch. R. 38, 39, and cases cited; 8 How. 158; 13 Conn. R. 136; 7 Watts & Serg. 317. In this it precisely resembles the "transaction;" or compromise of the civil law. C. C. art. 3040, 3048.

And a release must be just, equitable, and meritorious, or it is held for naught, and especially in matters of trust. 1 Sch. & Lef. 226; 16 Pet. R. 276 – 279; 4 How. R. 561, and the case of Kennedy's Heirs v. Collins, manuscript decision, Sup. Ct. U. S., Dec. Term, 1850, 10 How. 174. Release explained, put on its merits, and annulled. 3 Story's R. 268, 269.

Upon all the preceding authorities, it is obvious that this pretended release is utterly null — shadow, without substance.

It is null, also, upon the pleadings. The bill attacks this release for the directly imputed reason, that it is destitute of all consideration. The answer (as in the place of a plea) does not deny this, but avers the paper is a release, notwithstanding this defect.

Such form of defence is held for naught, and no proof could remedy it. The plea, in such case, must aver and set forth what the consideration was. Story's Eq. Pl. § 796, 797; Mitf. Pl. 261 – 263, 322 – 324.

*Mr. Butler*, for the appellee, made the following points amongst others which are omitted, (because the decision of the court did not turn upon them.)

II. The bill does not allege any substantial act of part performance by complainant, nor does it contain any offer to pay the one half of the cost of the property. Upon such a bill, specific

performance of the agreement of April 16, 1821, would not have been decreed, even had the bill been filed before 1825.

First. Packwood promises to transfer to Dorsey, for a certain price to be paid by him, the one half of the plantation, &c. Such a promise, by the law of Louisiana, is a sale; and to entitle the vendee to a specific performance, he must show that he has paid, or must offer to pay, the stipulated price. Old Civil Code of Louisiana, in force in 1821, 346, art. 9; Louisiana New Civil Code, art. 2437; Code Napoleon, art. 1589.

Secondly. So far as the agreement provides for the payment of the price by the one half the profits, or promises to account therefor, it creates, not a joint interest or partnership, as assumed in the bill, but an informal and void donation.

1. It is not a contract of partnership, because Dorsey does not bind himself to put any thing into it. Old Civil Code, 388, art. 3; New Civil Code of La. art. 1757; Domat, Liv. 1, tit. 8, § 2, art. 12; Pothier, Traité du Contrat de Société, ch. 1, § 3, art. 8; Story on Partnership, § 8, 15.

2. It is a donation, because nothing is given or promised by Dorsey; and as such it is void, because not in the form required by the law of Louisiana. Old Civil Code of Louisiana, p. 208, arts. 1, 2, pp. 218, 219; arts. 43, 52; pp. 220, 221; arts. 53, 65.

Thirdly. The agreement was without consideration or mutuality; and Courts of Equity will not decree specific performance of such arrgements.

1. The agreement on the part of Packwood, was wholly gratuitous. Such agreements, if actually executed, and if otherwise unobjectionable, will be sustained; but if, as in the present case, merely executory, they will not be enforced. 2 Story's Eq. Jur. § 787, 793, a; Wycherley v. Wycherly, 2 Eden's R. 177; Colman v. Sarrell, 1 Ves. Jun. 54; Ellison v. Ellison, 6 Ves. 662; Bunn v. Winthrop, 1 Johns, Ch. R. 329, 336, 337; Minturn v. Seymour, 4 Johns. Ch. R. 497; Acker v. Phœnix, 4 Paige, R. 305; Black v. Cord, 2 Harr. & Gill, 100; Caldwell v. Williams, 1 Bailey's Eq. R. 175.

The modern cases, in which executory agreements, in favor of children and other relatives, though voluntary, have been enforced, besides being, some of them, of questionable authority, all proceed on the ground that such agreements being made for the benefit of persons for whom the party was bound to provide, are founded on a consideration, meritorious, though not on a valuable, and are, therefore, inapplicable to the present case. Story's Eq. Jur. § 793, b; White's Lead. Cas. in Eq. 49 Law Lib. 167, 193, Eng. ed., 192, 213, Am. ed.; Id. for Am. Cas. pp. 213, 220.

2. The agreement, as interpreted by the allegations and claims of the bill, is wholly without mutuality, and, therefore, equity

will not enforce it. 2 Story's Eq. Jur. § 742, 750, 769, 771, 776, 790, 793, 796; Armiger *v.* Clark, Bunbury's Rep. 111; Lawrenson *v.* Butler, 1 Sch. and Lef. 13; Withy *v.* Cottle, 1 Sim. & Stu. 174; Howell *v.* George, 1 Madd. Ch. R. 12; Adderly *v.* Dixon, 1 Sim. & Stu. 607; Martin *v.* Mitchell, 2 Jac. & Walk. 413; Flight *v.* Bolland, 4 Russell's R. 298; Hamilton *v.* Grant, 2 Dow's P. C. 33; Sugden's Law of Prop. (in House of Lords,) 48 Law Lib. N. S., 58 Eng. ed., 69 Am. ed.; Benedict *v.* Lynch, 1 Johns. Ch. R. 373; German *v.* Machin, 6 Paige, 292, and cases cited by Ch. Walworth; Woodward *v.* Harris, 2 Barbour's Sup. Ct. R. 442; Phillips *v.* Berger, Id. 610.

III. The letter of complainant of the 18th of January, 1825, and his subsequent correspondence and acts amount to a full waiver and abandonment of all rights and claims of every nature and description under the agreement. As to the effect of waiver and abandonment in cases of specific performance, see 2 Story's Eq. Jur. § 770, 771, 776, and cases there cited. See also cases cited *post*, point 7.

V. If the complainant, under the agreement of 1821, had any rights in the plantation, &c., they were all released by the instrument of the 28th of January, 1836.

1. Such an instrument, by the law of Louisiana, is valid and effectual as a remission or release, though without consideration, and not under seal. Civil Code of Louisiana, arts. 2,126, 2,195 to 2,202, 3,061, and particularly art. 2,197. French — "*La remise d'une dette*," &c.; English — " The release or remission of a debt," &c. Id. arts. 812 to 816. In each art. French — "*la remise*"; English — "the release." 4 Favard de Langlade, 831, word "*remise*." Word "*remise*," in Pothier on Obligations, as translated by Evans and Martin.

2. Such conventional releases are favored by the civil law. Bardet, tom. i. liv. 3, ch. 24, *arrêt du 8 Feb. 1629*; Moulton *v.* Noble, 1 Ann. Rep. of La. 192, and authorities there cited by Eustis, Ch. J. Bourgoin *v.* Bourgoin, Sirey, 1814, 1st part, p. 85; 10 Duranton, 321, Paris ed. of 1844, No. 339; Ardouin *v.* Ardent, in Court of Cassation, 2d April, 1823, Sirey, 1823, 1st part p. 238, 2d part p. 113, quoted and approved in 4 Favard de Langlade, p. 821, 17 Ledru Rollin, 1006, 10 Dalloz, 612.

3. Such a release is valid, though the contract it was intended to release remain in the hands of the obligee or of a third person. Authorities above cited under this point; 12 Duranton 441, Paris ed. of 1844, No. 360.

VII. Complainant's claim is wholly barred by prescription and lapse of time.

1. The respondent having acquired the plantation, &c., in good faith and by a just title, and the complainant being a resident

of Louisiana, his claim was barred by the prescription of ten years, provided by the law of that State. Civil Code of Louisiana, arts. 3,442 to 3,464, 3,494 to 3,498, 3,508 to 3,511; 2 Story's Eq. Jur. § 1,520 and note 3.

2. Independently of positive prescription, the general doctrines of the Courts of Equity forbid, after such laches, such lapse of time, and such changes in the property as have occurred in this case, the granting to the complainant of any part of the relief sought by him. 2 Story's Eq. Jur. § 723, and sections cited under point 2; Id. § 1520, note 3; Smith v. Clay, 3 Brown's Ch. R. 639 n.; Hovenden v. Annesly, 2 Sch. & Lef. R. 636; Brashier v. Gratz, 6 Wheat. 528; Piatt v. Vattier, 9 Pet. 405, 416; Taylor v. Longworth, 14 Pet. 174; McKnight v. Taylor, 1 How. S. C. R. 167; Wagner v. Baird, 7 Id. 235; Maxwell v. Kennedy, 8 Id. 221.

Mr. Justice GRIER delivered the opinion of the court.

The record of this case covers 840 pages; and the abstracts and briefs of counsel, nearly three hundred. But as the merits of the case, when extricated from the mass of matter with which it is enveloped, depend on the application of undisputed principles and axioms of the law, to a few leading facts, it will not be necessary that our statement of it should be proportionally voluminous.

Dorsey, the complainant and appellant, filed his bill in the Circuit Court of Louisiana in March, 1848, claiming the specific execution of a contract in writing, executed on the 16th of April, 1821, which is as follows:

"Samuel Packwood, now in the city of New Orleans, having lately purchased the plantation heretofore belonging to John La Farge, situated below town on the right bank of the river, about eleven leagues, binds himself, his heirs and executors, to transfer unto G. Dorsey, his heirs and executors, one half of the plantation above mentioned, also one half of the slaves, cattle, and stock, farming utensils, &c., &c., as soon as said G. Dorsey shall pay for one half of the cost of said property, either with his own private means, or with one half of the profits of the plantation; but it is agreed upon and well understood by said G. Dorsey, that Samuel Packwood, until said transfer is made, has the right and privilege of selling and disposing and transferring of said plantation to any person or persons that he may think proper to sell to, without consulting or asking the consent of said G. Dorsey, and the consent of said G. Dorsey shall not be necessary to make the sale good; and it is further agreed upon, that Samuel Packwood is to have the entire and complete control of said plantation, and every thing that appertains to it, until said trans-

fer is made to G. Dorsey; but if said Packwood should sell at any time previous to said transfer to G. Dorsey, he shall be answerable for and shall account to said G. Dorsey for one half of the net profits of said sale."

At the time this paper was executed, Packwood resided in New York, but was owner of valuable property in New Orleans, from which he derived his principal income. Dorsey was his son-in-law, and a member of the mercantile firm of Morgan, Dorsey & Co. This firm was in good credit, and acted as the financial agent of Packwood, lending him their acceptances, and advancing money for him, to enable him to complete his purchases, up to the time of their failure and bankruptcy in 1825. At this time the firm was largely in advance to Packwood; but the balance due was afterwards paid by him, with interest. Dorsey had been chiefly instrumental in persuading Packwood to make this purchase, and owing to his expectation of a share in the speculation in case it should turn out to be profitable, the commissions charged for these financial accommodations were probably not so great as they otherwise might have been, and for the same reasons, also, Dorsey took an interest in the management of the plantation, made additional purchases, gave advice and superintendence, without at first making such additional charges as might have been made for similar services rendered to a stranger.

When this purchase was made, the parties seem to have expected that after the first payment of $25,000 was made by Packwood, the profits of the plantation might in a great measure be depended on, to liquidate the balance of its cost. But they were greatly deceived in this expectation. For many years the crops did not equal the expenses; so that, at the time of the failure of the firm of Morgan, Dorsey & Co., in 1825, Packwood was in debt for the plantation and the additional purchases of land and negroes, a sum exceeding one hundred and fifty thousand dollars, ($150,000.) Dorsey had paid nothing, and was then unable to pay any thing. The speculation seeming likely to turn out disastrous, he ceased to expect any advantage from it, or claim any interest in it, and accordingly, he advised Packwood to sell the greater part, if not all of it, "with the hope that he (Packwood) might get out of the scrape in four or five years." Indeed for some years after this it appeared doubtful whether Packwood would be able to extricate himself from his pecuniary embarrassments consequent on this purchase. He finally succeeded, however, after a further struggle of some twelve or fifteen years, by sales of his other property and the profits of the plantation, to rescue himself from impending ruin, and pay the debts in which he had been involved. During all

this time, Dorsey was unable to help Packwood out of his diffi-
culties, and ceasing to consider his expectations from Pack-
wood's contract with him to be of any value, and as it might be
considered a cloud upon the title, at the request of Packwood
he voluntarily executed and sent to him the following release,
witnessed by his wife: —

" This is to certify, that I hereby abandon and release unto
Mr. Samuel Packwood, any claim I have or might have to any
interest in or to his plantation, in the parish of Plaquemines,
or profits of the same, by virtue of any written document he may
have given, or verbal promises made upon the subject."

New Orleans, 28th January, 1836.            G. DORSEY.

Witness : E. H. Dorsey.

From this time till 1838, Dorsey had the agency of the plant-
ation under a power of attorney from Packwood.   In that year
Packwood cancelled his power of attorney, and appointed another
agent, alleging that Dorsey had misused his power by indorsing
his principal's name to sustain his private credit.   This was the
beginning of a coldness between the parties, which, after the re-
fusal of Packwood to incur liabilities for Dorsey in 1840, and
after the death of Mrs. Alice Packwood, the mother of Mrs.
Dorsey, and the marriage of Packwood to a second wife, be-
came a bitter family quarrel, followed by much litigation be-
tween the present parties.   The nature and result of these suits,
it is not necessary, for the purposes of the present case, to specify.
Suffice to say, that Dorsey now revived his claim to a share in
the Myrtle Grove property, on the ground that his half of the
purchase-money had been paid by the rents and profits of the
estate, and finally instituted this suit in March, 1848.

In the original bill, the complainant founds his title to relief
on an alleged lost agreement, dated on the 12th of April,
1823.   But after the production by the respondent, of this
instrument, dated 16th of April, 1821, he amended his bill,
and made his claim under it.   The respondent, in his an-
swer, denies the existence of any other agreement either writ-
ten or parol, and there is no proof to show the existence of
either.   The right of the complainant to relief will therefore de-
pend on this instrument of writing, in connection with the facts,
a brief outline of which we have endeavored to give, so far as
we think them material to the decision of the cause.

There is no allegation in the bill, or proof, that any clause
was omitted from this instrument, either through mistake or in-
advertence.  It is signed by both parties in presence of attest-
ing witnesses; and is expressed in clear and precise terms.   But
there is one characteristic necessary to give it validity as a bind-
ing contract, in which it is entirely deficient.   It wants mutuality.

It imposes no obligation on Dorsey whatever. He is not bound either to render services or pay money as a consideration for one half the land. Packwood could not support a suit upon it to compel Dorsey to do any thing. It is not an alternative obligation, because Dorsey is not bound to perform either alternative. The allegation that "Dorsey elected the alternative of paying for the land out of the profits," (or, in other words, with Packwood's money,) amounts only to this : That he was willing to accept one half of the plantation as a gift, but would pay no part of the purchase-money out of his own pocket. Nor is there any evidence, that Dorsey ever notified Packwood of his election to do any thing. On the contrary, in January, 1825, before the failure of the firm of Morgan, Dorsey & Co., when the speculation appeared likely to be a ruinous one, he *elects* to have Packwood "get out of the scrape," the best way he could, and his release, given in 1836, shows his election to claim no interest in the property whatever. But even assuming that Dorsey was bound by this contract, it cannot come within the category of alternative obligations, where one of the alternatives was to pay with Packwood's money, and give nothing of his own.

"An obligation," says Pothier, "is not alternative, where one of the things is not susceptible of the obligation intended to be contracted ; but in this case the obligation is a determinate obligation of the other. Therefore it was decided, in l. 72, § 4, ff. *de sol*, that if a person promised me in the alternative two things, whereof one belonged to me already, that he had not the liberty of paying that in lieu of the other — not even although it might afterwards cease to belong to me; because this not being, at the time of the contract, susceptible of the obligation contracted in my favor, the other only was due ; *cum re sua nemo deberi possit*." Evans's Pothier, Part 2d., C. 3, Art. 6, No. 249. Assuming the obligation to be mutual, Dorsey was bound to "pay with his own private means one half of the cost" of the property, or offer to do it within a reasonable time, before he could claim the interference of a court of equity to enforce a specific execution of this contract. Equity will not decree the specific execution of mere nude pacts, or voluntary agreements not founded on some valuable or meritorious consideration. The same rule is applied to imperfect gifts, *inter vivos*, to imperfect voluntary assignments of debts or other property, to voluntary executive trusts, and to voluntary defective conveyances.

When the obligation is mutual, the party asking a specific performance must show that he has been in no default in not having performed the agreement on his part, and that he has taken all proper steps towards the performance. He must show himself desirous, prompt and eager to perform the contract If

he has been guilty of gross laches,.or if he applies for relief after a long lapse of time, unexplained by equitable circumstances, his bill will be dismissed.

It is clear, then, from this statement of the facts and law as they affect this case, that the complainant has not shown a case which will entitle him to a decree in his favor.

For 1st. If he was bound at all, he has shown no performance, or offer of performance, after an interval of twenty-seven years.

2dly. The agreement by Packwood to convey one half of the land purchased and paid for by himself, in consideration of a payment "from the profits of the plantation," which equally belonged to himself, was but the promise of a gift, a nude pact which equity will not enforce.

3dly. The release of the complainant in 1836, fifteen years after the agreement, when he had paid nothing for the land, either out of his own pocket, or even "by the profits of the plantation," (if such could be called a payment) was a voluntary abandonment of all claim under it. Whether, if he had paid one half the purchase-money, and had a good equitable title to the land, a release without a consideration would operate as an equitable bar to his claim, we need not inquire. But as cumulative evidence of a total abandonment of all claim under an executory agreement of which he had performed no part, it furnishes an additional reason for refusing him a decree, to which he would not be entitled, even if such release had never been given.

The decree of the Circuit Court is therefore affirmed with costs.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed with costs.