## CITY NAT. BANK BLDG. CO. v. HELVERING, Commissioner of Internal Revenue.

### No. 6914.

United States Court of Appeals for the District of Columbia.

Argued Dec. 10, 1937.

Decided April 11, 1938.

T. Baxter Milne, of Washington, D. C., and F. S. Gaines, of Omaha, Neb., for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key, Morrison Shafroth, Ellis N. Slack, and Ralph E. Smith, all of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

GRONER, C. J.

This petition involves assessed deficiencies in income taxes for the 3 years, 1929-31. Petitioner is a Delaware corporation with its principal office in Omaha, Neb. It took deductions for depreciation on a certain office building in Omaha claimed to be owned by it. The Commissioner disallowed the deductions and assessed deficiencies amounting in the aggregate to approximately $5,000 for the 3 years. The Board, with four dissents, sustained the Commissioner, and this review followed.

A short statement of the facts found is as follows: Rufus E. Lee, an investment banker of Omaha, in association with Otis & Co., investment bankers of Cleveland, Ohio, obtained in 1925 an option to purchase the entire capital stock of a Nebraska corporation for $940,000. That corporation owned a 16-story office building in Omaha subject to a mortgage of $560,000. Lee and Otis & Co. organized petitioner, City National Bank Building Company, subscribing equally to the whole of its capital stock (2,000 shares at $1 per share), assigned the option to it; and petitioner thereupon exercised the option.

All subsequent events material in the consideration of the case took place on June 1, 1925, simultaneously. We shall recount them in their logical order. First, the Nebraska corporation conveyed the land and building by deed of bargain and sale to petitioner. Petitioner conveyed it in fee to Union Trust Company of Cleveland, Ohio. Trust Company executed a lease of the building to petitioner at an annual rental of $55,000 for a term of 99 years, renewable forever, and with an exclusive

option to purchase. Trust Company also executed a declaration of trust reciting that 1,000 land trust certificates had been issued by it at the face value of $1,000 each, with interest of 5½ per cent. and with no fixed redemption date, and declaring that it, Trust Company, held the property in trust for the owners of the certificates. Petitioner received $930,000 from the sale of the certificates (face value less discount and commissions for selling). Then petitioner executed a mortgage on its leasehold and issued $600,000 face value of 6½ per cent. 15-year sinking fund bonds. These it sold, receiving therefor $540,000. As the result of these transactions, petitioner had the proceeds of the sale of the certificates and bonds, amounting to $1,470,000. The cost of the Nebraska corporation stock, plus the mortgage debt of that corporation, plus a commission of $25,000, totaled $1,525,000 which petitioner was obligated to discharge. The $1,470,000 which it had, plus a contribution from Lee and Otis & Co. of $55,000, provided funds to discharge the entire debt, and in the end the situation was that petitioner had a 99-year lease renewable forever with an option to purchase, Trust Company was lessor and record owner of the legal title, and the certificates and leasehold bonds were owned by sundry investors. The rental under the lease was $55,000 net, exactly the amount of the interest on the trust certificates, and the lease contained an option to repurchase on any rentpaying date by the payment of $1,050,000—equal to par and a premium of $50 for each outstanding certificate. Petitioner, besides having to pay rent of $55,000, had to pay taxes, assessments, repairs, upkeep, insurance, the trustee's commissions, and, in case of loss by casualty, had to pay for restoration.

The record shows that Lee, president of petitioner, had not previously dealt as an investment banker in land trust certificates, and that he and his associate, Otis & Co., adopted that particular method because there was demand in the state of Ohio for that form of securities. In other words, that he selected trust certificates rather than bonds as the method of financing the purchase of the property because of the greater demand for the former as an investment in Ohio where it was expected to sell them. Lee testified he would not have sold the property to the Trust Company or to any one else for $930,000 for the reason that he and his associate had then already agreed to buy it and pay $1,500,000 for it.

He insists that the method adopted was not a sale but a loan, though he was required to give technically a deed to the property.

Regarding the case in the aspect described above, it is apparent this is not a case where a corporation owned property and sold it in order to get rid of it. Instead, it is a case where a corporation sold property in order to purchase it; for we may safely assume that petitioner, setting out to buy the property for a million and a half dollars, would not simultaneously have sold the fee for the inadequate price obtained through the sale of the trust certificates. The question, then, for decision is whether petitioner is entitled to depreciation on the building.

The answer must be found in the correct construction of section 23(k) of the Revenue Act of 1928, 45 Stat. 791, 26 U.S.C.A. § 23(*l*) and note, which authorizes:

"A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

The position which the Commissioner takes is that the transaction between petitioner and Trust Company was not a mortgage but an absolute sale, leaving petitioner with nothing but a leasehold estate, and also that petitioner can claim to have no capital investment in the property since it has got back the whole of its investment. Petitioner, on the other hand, says that the question is not: Who holds the legal title?—but instead: Whose property is it which is depreciated? It insists there is no question that the deed to the trust company was executed only as security for a loan and that the intention of the parties should control, and that the deed, though absolute in form, should be construed as a mortgage. To sustain its position in this respect petitioner relies upon Peugh v. Davis, 96 U.S. 332, 24 L.Ed. 775, in which case the Supreme Court said that a court of equity will treat a deed absolute in form as a mortgage when it is executed as security for a loan of money.

The question is not new. In F. & R. Lazarus & Co. v. Commissioner, 32 B.T.A. 633, the facts were in all essential respects identical. There, as here, the owner of a building desiring to refinance the same conveyed it to a trustee in fee and at the same time took a deed of lease for 99 years renewable, etc., with an option to purchase. There, as here, it claimed depreciation on the building and there, as here, the Commis-

sioner disallowed the claim. But in that case the Board said "The important question is not, in whom vests the fee or when it vested, but who made the investment of the capital which is to be recovered over a period of the exhaustion of the property." Based on this rule, the Board held that although the deed was absolute in form it should in the circumstances be treated as a mortgage since, as the Board found, it was executed as security for a loan.

Again in H. F. Neighbors Company v. Commissioner (unpublished) the Board, under the same state of facts, adhered to its opinion in the Lazarus Case, and on appeal to the Sixth Circuit (Commissioner of Internal Revenue v. H. F. Neighbors Realty Co., 81 F.2d 173) the Board's decision was affirmed.

In the instant case, however, the Board took a different view of the statute, 34 B.T. A., 93, 96, and, contrary to its former opinion, held that petiitoner, having conveyed fee-simple title to the trust company, was thereafter only a lessee, and that, since petitioner, by its refinancing arrangement through the sale of certificates and bonds, had been repaid its capital outlay, it had no investment in the building and therefore was not entitled to depreciation. This change of viewpoint was, doubtless, induced by the decision of the Supreme Court in Senior v. Braden, 295 U.S. 422, 55 S.Ct. 800, 79 L.Ed. 1520, 100 A.L.R. 794. And if, as the Board thought, that case is decisive of the issue here, we need go no farther. The question in Senior v. Braden, supra, was whether one of the identical "certificates" we are concerned with here was an interest in land or was a species of intangible personal property or chose in action subject to the Ohio intangibles tax. The case arose by reason of the action of the tax officer of Hamilton county, Ohio, in assessing the certificate—in the hands of Senior, the owner,—for taxation under the Ohio intangibles tax law. To prevent this Senior instituted suit in the state court, alleging that the certificate represented an interest in land and that the tax was unconstitutional because the state was without power to tax land or interests in land situated beyond its borders or within its borders otherwise than by uniform rule according to value. The Supreme Court reached the conclusion that the certificate was not a chose in action, but was an evidence of the holder's ownership of the equitable fee of the land. Accepting the decision, as of course we do, as determinative of the rights of the certificate holders, it would seem to us to follow that the case holds that the deed from petitioner to the trust company was an outright conveyance in fee of the land and not a mortgage. For if the transaction was a loan Senior would have had a mortgage bond, which would have been a chose in action and not an interest in land. Unless, therefore, there are other and additional facts which distinguish the present case from Senior v. Braden, supra, we should have to affirm the Board's decision on the authority of that case. But petitioner says there are such additional facts. It says that in the Senior Case the question turned wholly upon the legal effect of the deed under which the trust certificates were issued, and that the Supreme Court, with nothing more, construed it precisely as it was written; and, since it was just an ordinary conveyance of land with general covenants of title, any other conclusion was impossible. But here, petitioner says, the Commissioner and the Board had before them, in addition to the deed and certificates, undeniable evidence of the true motive and intent of the parties in making the conveyance and in taking back the lease. And this evidence, petitioner insists, shows that there was never an intent to sell the property but rather a purpose to establish a trust for the payment of interest and for the security of the debt. In this view, petitioner insists it is, and should under the rule in the Peugh Case be said to be, the owner of the building. Applying the rule in Peugh v. Davis, supra, the Sixth Circuit in Commissioner v. Neighbors, supra, held that by treating the conveyance in fee as a trust, as they thought should be done, the consequent ownership of the property entitled the owner to the allowable deduction for depreciation; but with great deference to that opinion we are unable to follow it.

In the view we take of the facts there can be no doubt that the parties in the transactions which occurred June 1, 1925, precisely carried out their intentions and that the motive was to acquire more easily marketable securities which could be converted into cash to furnish the money to purchase the building. In these circumstances, to apply the equitable doctrine in Peugh v. Davis, supra, and call the transfer of the fee a mortgage or a deed of trust would be to extend that rule into a field where it has no proper application. The certificates which the trust company issued

were neither bonds nor notes. They had no stated maturity, and there was no obligation either on the trust company or on petitioner to redeem them at any time or at all. Each certificate states on its face that the holder is entitled to a fraction of the equitable ownership and beneficial interest in the real estate. Nor is there any reason to describe the transaction as a loan. The word "loan" implies an obligation to repay. Petitioner, it is true, has the option to redeem and discharge the certificates, but it is only an option. If it elects never to exercise the option, the holders will continue in perpetuity their equitable ownership in the leased property. Petitioner never at anytime owed anything to the holders of the certificates. Its obligation under the contract with the trust company was satisfied by the payment of rent, and this the trust company distributed as interest to the holders of the beneficial rights in the property. In this view we can find no proper ground on which to treat the sale as a loan or the certificates as a debt.

Nor is there anything to show that petitioner has a capital investment in the property. Petitioner paid out, it is true, a million and a half dollars, but part of this it got by mortgaging its leasehold, and the rest came from the sale of trust certificates. The mortgage it gave obligated the leasehold and not the building, and the Commissioner has allowed amortization as to it, and the money received from the certificates petitioner does not owe and cannot be compelled to repay.

The Revenue Act of 1928 allows deduction for exhaustion of property, but the test is, can the claimant, whatever his relationship to the property—as owner, lessee, lessor, etc.—show a depreciating capital investment? The purpose of the depreciation allowance is to permit the person whose money is invested to recover through annual deductions an amount equal to the original outlay. The Board, speaking to this aspect of the present case, said:

"The petitioner sold the property to the Union Trust Co. of Cleveland, Ohio, by a warranty deed, and received therefor $930,-000 in cash and a valuable leasehold. The $930,000 in cash which it received was obviously a return to it of so much of its capital investment in the property and, since it thus recovered that portion of its capital investment, the same amount should

not be again recovered by it through deductions for depreciation on the property of others. The remainder of its original cost was recovered through the receipt of a valuable leasehold, and that part of its original capital investment in the property should not be again recovered by it through deductions for depreciation on the property of others. * * * The petitioner is entitled to and has received the benefit of proper deductions for the exhaustion of the leasehold. It may also be entitled to deductions for amortization of discount on its bonds secured by the mortgage on the leasehold.[1] It has claimed and has been allowed deductions for the rent which it pays under the lease. * * *"

And the Board continued:

"If a new building is ever to replace the present building during the term of the lease, the petitioner will probably have to pay for its erection. That cost will represent additional cost of the leasehold, since the building will not belong to the petitioner. That additional cost, if paid, will be recoverable through annual depreciation charges. * * * The petitioner may not anticipate such future additional costs of its leasehold. * * * A present deduction in anticipation of future additional cost would not be a 'reasonable' deduction. If the petitioner decides to forfeit the lease when the present building wears out, its loss will be no more than the unexhausted cost of the leasehold. It can not lose the entire original cost to it of the building, because it sold the building in 1925 and most, if not all of its original cost was restored to it at that time. If it were allowed annual deductions of $22,500, and then were to default on the lease when the present building wears out, it would have received a substantial amount of income tax free. Congress did not so intend."

We think this reasoning sound. Here, as we have seen, petitioner has consistently deducted as a part of its ordinary and necessary expenses all sums paid by it for operation, insurance, interest, upkeep, repairs, taxes, and also the $55,000 paid annually as rent of the property. It is not shown to have paid out anything for betterments and additions to the leased premises. In its actual operation and control of the property, it is in all respects in the position of a tenant. But even if it be considered as owner, it is apparent it has got back

---

[1] We think petitioner is clearly so entitled and should be allowed the deduction if it is still in a position to claim it.

all that it put out. When, in the course of time, it is called upon to replace worn-out and unusable parts of the premises or to add thereto, a different situation will exist, but that is not the present case.

What we find here is more like Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720, than like Cogar v. Commissioner, 9 Cir., 44 F.2d 554, 564. In the Wiener Case the taxpayer was in the business of taking long leases of property and subletting. He held 13 leases for 99 years renewable forever. He claimed the right to make an annual deduction from his income tax for estimated depreciation of the buildings. He was allowed to deduct repairs, but not estimated obsolescence. In that case, as in this, the lessee had undertaken to keep the buildings in their present condition, to pay the rent, and in the event of destruction to restore the buildings and to forfeit the lease upon default. And it was argued that growing out of the necessity of the case, the lessee had to keep the buildings—as in this case it is required by the lease to do—in like condition and repair as when leased; and there it was insisted that the amount needed for this purpose should be allowed. Answering this contention, the Supreme Court said that in order to permit an allowance for obsolescence the amount claimed must be shown to be out of pocket cost—actual and present loss and not loss more or less sure to occur in the future. In other words, that depreciation as claimed here is never allowable unless the capital of the claimant has gone into the property. Where it has gone into the property, whether the claimant be owner or lessee, a deduction is allowable, but in either case there must be a present loss of invested capital to make the statute apply. See, also, in this connection our opinion in Belt Railway Co. v. Commissioner, 59 App.D.C. 137, 36 F. 2d 541.

■ Second. Petitioner asks in the alternative that, if we should hold it is not entitled to deduct depreciation, then in any event the amortization allowances of $5,950 computed annually by the Commissioner, representing 1 per cent. of the cost of· the leasehold, be increased so as to permit amortization on the basis of the 33-year life of the building rather than the 99-year period of the lease. To sustain this position petitioner argues that it has an investment of $595,000 in the leasehold; that the Commissioner has recognized this investment, but has fixed the rate of amortization at 1 per cent. annually for the whole term of the lease (99 years), whereas by stipulation the life of the building is only 33 years. This, petitioner says, is unfair and insists that the amortization should be at the rate of 3 per cent. annually for 33 years rather than 1 per cent. annually for 99 years. Duffy v. Central Railroad Co. of New Jersey, 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846, is cited as authority for this position. That was a case in which the railroad company operated certain railroad facilities under a 999-year lease which required it to maintain and keep the property in good order and repair, and held certain pier property under a 30-year lease which required it to make large expenditures. It sought to deduct as "rentals or other payments" large sums of money spent for additions, betterments, and replacements under the leases. The Supreme Court held against the lessee railroad, but said of the additions, etc., which it had made that, since some of them would undoubtedly be consumed within a fraction of the term of the 999-year lease, an allowance could be taken for annual depreciation, and in the case of others which would probably outlast the term of the 30-year lease deductions might properly be taken in the form of proportionate annual allowances for exhaustion. But we think there is nothing in the decision which fits the situation we are now discussing.

Here petitioner obtained a lease of land and building for 99 years. It paid in cash for the leasehold $595,000 and agreed to pay the rental money as it became due from year to year. Obviously the value of the leasehold will depreciate from year to year until its termination, and petitioner is entitled to an allowance accordingly. But in effect what petitioner asks is that the whole of its expenditure for the leasehold be applied against the building, and, since the building theoretically has a life of only 33 years, the depreciation allowance be confined to that period; but there is nothing in the statute or in the regulations which would permit this to be done. Petitioner purchased the leasehold of the entire property, land and building, for the sum of $595,000 and obligated itself to maintain the. building on the premises during the entire period of the lease. If that obligation involves the necessity for the expenditure of money in the construction of a new building at the end of 33 years, the money so expended will be a capital investment returnable to petitioner over the life of the new structure in accordance with the laws

and regulations then prevailing. But here, as we have already seen, petitioner has no capital investment in the present building, and, if amortization of the lease be allowed on the basis of 33 years, then by the time the lease has run one-third of its course petitioner will have recovered its entire investment therein and will still have the leasehold for the remaining 66 years. Petitioner's contention overlooks the ·fact that under its lease it must keep the building, throughout the 99 years, in good and tenantable condition, so that, if the obligations of the lease are· met, the building will not actually, though it may theoretically, be completely depreciated at the end of 33 years; and, since we must assume that the whole contract will be observed and not broken, petitioner's relation to the property is to be determined on that assumption. Wells v. Savannah, 181 U.S. 531, 545, 21 S.Ct. 697, 45 L.Ed. 986. In our opinion petitioner cannot prevail on this point.

Affirmed.

STEPHENS, Associate Justice (concurring).

The majority opinion, as I read it, rests essentially upon two points: first, that the transaction was a sale, not a loan; second, that the petitioner had no capital investment in the property.

Against these points a cogent argument can be made for the petitioner as follows. As to the first point: The conclusion that there was no loan is reached because on the face of the papers there was no stated maturity date and no stated duty to repay a debt. But the testimony of the witnesses Lee and Harris was to the effect that the intention of the parties was that the transaction should be merely a means of financing, that it should be a loan rather than a sale. If that be the fact, then the doctrine of Peugh v. Davis, 1877, 96 U.S. 332, 24 L. Ed. 775, is applicable. Within that doctrine a deed absolute upon its face may be shown to have been a mortgage if that was the intention of the parties when the deed was given. While that doctrine is ordinarily applied in redemption suits between the original parties, it may also be availed of by a party in a controversy with a stranger if this will not operate to harm others who have relied upon the form of the transaction. Walton v. Cronly's Administrator, 1835, 14 Wend., N.Y., 63; Stumpe v. Kopp, 1907, 201 Mo. 412, 99 S.W. 1073. No proper reason exists why it should not be applied here. The essence of the doctrine is that equity will regard the substance rather than the form, will give effect to the. actual contract of the parties. The courts in tax issues between the Government and the citizen should look at the real character of the transactions involved, rather than at the form thereof, if no harm will come to third persons in so doing. No harm can come to the certificate holders in the present case if for no other reason than that since the certificate holders are not parties to this suit the decision herein cannot be *res judicata* as to them; and it cannot be claimed that the Government relied to its detriment upon the form of the transaction. To the effect that the courts will look through form to substance to ascertain the essential nature of a transaction in tax cases as well as in equitable cases, see: Eisner v. Macomber, 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570; United States v. Phellis, 1921, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180; Weiss v. Stearn, 1924, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520. These are cited in Commissioner of Internal Revenue v. H. F. Neighbors Realty Co., 6 Cir. 1936, 81 F.2d 173. Senior v. Braden, 1935, 295 U.S. 422, 55 S.Ct. 800, 79 L.Ed. 1520, 100 A.L.R. 794, is not controlling because it did not pass upon the question in the instant case. It held only that the trust certificates were under Ohio law not taxable against the holders as intangibles for the reason that they represented an interest in the property. As to the second point—that the petitioner had no capital investment in the property— that falls with the first,.because if the transaction was a loan, not a sale, then in essence the petitioner bought the property from the Nebraska corporation and kept it; that it bought it with borrowed money made the investment none the less that of the petitioner.

Convincing as seems the foregoing argument for the petitioner, it appears to me that the result reached by the majority is nevertheless correct, but for a reason not clearly expressed in the majority opinion. It is true that the witnesses Lee and Harris testified that the intention of the parties was that the transaction should be merely a means of financing, a loan rather than a sale. But the testimony of the witness Lee was also to the effect that the trust certificate form of financing was much in demand in Ohio at the time of this transaction, because while upon bonds the Ohio tax was quite heavy, there was no tax on land trust certificates in Ohio, where most

of the certificates were placed. The witness Harris specifically testified:

"The land trust certificates were a more popular means of financing at that time because it [this means of financing] developed out of the then existing tax situation in Ohio under which the first mortgage bonds were literally subject to the personal property tax which amounted to 2.50 or 2.55 or 2.60. The result was that those bonds became undesirable for a great many types of investments, investors who had to make public their holding for instance, such as a testamentary trust, and in those cases where the conscience of an investor required him literally to conform to the letter of the tax requirement obviously could not buy these bonds and retain them. This tax was only on first mortgage bonds in Ohio at that time and land trust certificates were tax-exempt. That was the principal distinction which I made as a seller of securities and as a layman. I regarded both the land trust certificate issues and mortgage bond issues as being merely forms of financing."

It thus appears that the transaction was put in the form that it was and trust certificates issued and marketed in Ohio for the definite purpose, and with the effect, of avoiding the Ohio tax on first mortgage bonds. The Ohio tax statutes in effect at the time of the transaction in question imposed a tax on "money loaned on pledge or mortgage of real estate, although a deed or other instrument may have been given for it, if between the parties thereto it is considered as security merely." See Ohio Gen.Code Ann., Throckmorton, 1926, §§ 5325, 5328; Patrick v. Littell, 1880, 36 Ohio St. 79, 38 Am.Rep. 552. Thus under the Ohio statutes the substance rather than the form of the transaction was the basis of taxation, and it seems necessarily to follow that in adopting the trust certificate method of financing, with the intent as shown by the testimony that the certificates should not be taxable under Ohio law, the parties must also be taken to have intended the necessary prerequisite under Ohio law to the non-taxability of the transaction as a mortgage of making it actually a sale, and the testimony that it was by the parties regarded as a means of financing only cannot negative this. The petitioner essentially relies, as above pointed out, upon an equitable doctrine that the court should look at the substance rather than at the form of the transaction. But he who seeks equity must do equity, and in my view the petitioner cannot in equity secure the advantage of having the transaction regarded in Ohio as a sale, for the purpose of making the trust certificates tax free under Ohio law and thus more marketable, and then ask that the transaction be regarded not as a sale but as a loan for the purpose under Federal law of diminishing by depreciation deductions its Federal income tax.