**BUILDING SYNDICATE CO., an Oregon corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 9887.**

United States District Court
D. Oregon.
Jan. 15, 1960.

Thomas B. Stoel, David G. Hayhurst and Hart, Spencer, McCulloch, Rockwood & Davies, Portland, Or., for plaintiff.

C. E. Luckey, U. S. Atty., Edward J. Georgeff, Asst. U. S. Atty., Portland, Or., for defendant.

KILKENNY, District Judge.

This is an action by plaintiff to recover from defendant certain income taxes paid by plaintiff.

In 1927 certain real property in Portland, Oregon, was owned by Northwestern National Bank of Portland.[1] Prior to June 21, 1927, Northwestern placed this property in the hands of a real estate broker for sale. Prior to that time, this broker had negotiated with George W. York & Company, Inc.[2] of Cleveland, Ohio, relative to financing the sale of the property. These negotiations culminated in a commitment by York dated June 21, 1927. Building Syndicate,[3] an Oregon corporation, was organized on August 1, 1927. Subsequent to June 21, 1927, York associated with it the Union Trust Company of Cleveland[4] for the purpose of carrying out its commitment. By deed dated September 16, 1927, Northwestern conveyed said property to Security Savings & Trust Company[5] (Portland, Ore-

gon). On September 30, 1957, Security and Union, as co-trustees, executed an agreement and declaration of trust between themselves and "the holders of land trust certificates of equitable ownership in the Northwestern building site located in Portland, Oregon, leased to Building Syndicate (an Oregon corporation)." On September 30, 1927, Security leased to Syndicate the property involved for a period of 99 years. As of September 21, 1927, Syndicate entered into an indenture with Lumberman's Trust Company[6] to secure an issue of $750,000 first leasehold bonds. Payment to the seller for the property and delivery of the above-described documents were effected in a single escrow transaction on September 30, 1927, pursuant to an escrow agreement entered into between Northwestern, Security, Lumberman's and Syndicate, with Title & Trust Company as escrow agent. The Northwestern property was conveyed to the trustees, Union and Security, for the benefit of the land trust certificate holders upon payment to the sellers of $2,202,133.07, the sources of these funds being:

| | |
|---|---|
| From trustee for Land Trust Certificate holders (proceeds of sale of 1,350 Land Trust Certificates of Equitable Ownership | $1,250,000.00 |
| From Building Syndicate (proceeds of sale of leasehold bonds and of stock) | 952,133.07 |
| | $2,202,133.07 |

In 1928 the name of the property was changed to American Bank Building. In 1932 the leasehold bonds of Syndicate went into default and a bondholder's committee was organized. In 1943, the bonds being still in default, the trustee for the bondholders acquired the company's assets on December 31st of that year. On November 9, 1944, a new corporation known as Building Syndicate

1. herein called Northwestern

2. herein called York

3. herein called Snydicate

4. herein called Union

5. herein called Security

6. herein called Lumberman's

Co.,[7] the plaintiff herein, was organized. The assets of Syndicate, including its lease on the bank property, were transferred to the new company on December 31, 1944, the acquisition of the assets by the trustee and their transfer to plaintiff being a tax free reorganization under the Internal Revenue Code. The lease contained an option to purchase the fee interest of the property from the lessor upon written notice. Plaintiff (new company) exercised this option to purchase on October 31, 1945, the sources of payment of the aforementioned option price being as follows:

| | |
|---|---|
| Proceeds of loan to Building Syndicate Co. from Prudential Insurance Company | $1,200,000 |
| Application of 138 Land Trust Certificates held by Trustee in depreciation fund pursuant to provisions of lease (at $1,050 per certificate) | 144,900 |
| Financed from corporate funds of Building Syndicate Co. | 72,600 |
| | $1,417,500 |

On their federal income tax returns from 1927 through 1944, the plaintiff and its predecessors claimed depreciation deductions on the bank building each year on the basis of the remaining life of the building,[8] rather than amortizing the cost over the 99 year leasehold period. On its tax return for the year 1945, plaintiff claimed depreciation from January 1, 1945, on the new allocated cost of the building based on an assumed life of 32 years from that date. For the ten months' period from January 1, 1945, to October 31, 1945, the depreciation so claimed amounted to $26,061.92. Under these methods plaintiff and its predecessor had claimed deductions through October 31, 1945, in the aggregate amount of $549,215.08. Computed on the basis of amortization over a 99-year life, the aggregate amortization of plaintiff's lease-

hold as of October 31, 1945, was $172,272.65.

On the income tax returns filed by the new company, it adjusted the cost basis of the property by adding the amount paid to redeem the land trust certificates and claimed a deduction for depreciation computed on the basis of this adjustment. To the extent the deductions thus claimed represented an amount for depreciation already allowed or allowable to Syndicate (old company) in its prior income tax returns, the Commissioner of Internal Revenue disallowed the deduction and assessed a tax deficiency. It is this deficiency which the plaintiff attempts to recover in this case.

Simply stated, the issue in this case is: Whether Syndicate properly claimed and was allowed an income tax deduction for depreciation on the American Bank Building (formerly Northwestern Bank Building) during the years 1927 through 1943 computed on the basis of the total purchase price paid to the original vendors of the property. The answer to the question is solved by determining whether Syndicate, during such years, should be treated as the owner, for tax purposes, of the building in question.

The corporate income and excess profit tax returns of Syndicate show that it regarded itself as the owner of the building during the years in question and that it claimed and was allowed an annual deduction for depreciation on the basis of such ownership. This method of reporting was used after examination and discussion by and with the Internal Revenue Service and most of the reports were filed after a final closing agreement was executed by Syndicate and the Revenue Service. These returns indicate that the amount received from the sale of the land trust certificates was regarded as a corporate liability of Syndicate and that the land and building were a corporate asset. The annual accounting reports of Syndicate consistently showed that it regarded itself as the owner of the bank building. These reports show

7. herein called new company

8. assumed in 1927 to be 32 years

the trust certificates as a corporate liability and one of these reports affirmatively stated that legal title was vested in the trustee merely as a method for financing the purchase of the building. Likewise, the minutes of the meetings of the stockholders and of the board of directors, and the financial records of Syndicate, very definitely show that it regarded itself as the owner of the bank building and that the land trust certificates were liabilities on which interest was paid and accrued. It is unnecessary to point to other documentary evidence which, with the above, conclusively shows that Syndicate regarded itself as the owner of this building.

The construction against interest, in a tax case, by a party to a contract is strong evidence of its meaning. Natco Corporation v. United States, 3 Cir., 1956, 240 F.2d 398, 403; Cutting v. Bryan, 9 Cir., 1929, 30 F.2d 754. Plaintiff urges that the testimony of the witnesses at the time of the trial overcomes the actions of Syndicate from 1927 through 1943, inclusive. The principal witnesses testified to an intention which would be directly opposed to the action taken by the directors of all interested groups. Furthermore, this testimony would be in direct conflict with what I consider a proper construction of the instruments signed by the respective parties. A witness' statement concerning intention does not weigh heavily against facts directly to the contrary. Flynn v. Crume, 7 Cir., 1939, 101 F.2d 661.

Aside from the documentary evidence above mentioned, the lease itself and the declaration of trust show that all parties to the transaction regarded Syndicate, not the trustees, as the real owner of the building. We call your attention to the following: Article IV of the Declaration of Trust, provides, among other things, for a depreciation fund, over which Syndicate had complete control if it so desired. This fund was connected with the right of Syndicate to exercise the option so that the entire fund could be used by Syndicate at any time it desired. Syndicate could ask for a transfer at any time into this depreciation fund of all of the land trust certificates, upon payment of $1,050 each. If such a thing would happen, the entire fee of the property would necessarily belong to Syndicate, in that there would be no other beneficiary of the trust. This trust agreement further provides that in the event of an exercise of the option given to Syndicate under the lease, any and all amounts which were in the depreciation fund should be credited on the purchase price. The lease was for a period of 99 years, renewable *forever*. The rental was fixed at 5½% of the principal amount advanced and remained so fixed, irrespective of future contingencies or change in the values of the real property. The lease provided that if the property was appropriated to public use, such appropriation constituted an election by the lessee to purchase the property and if the appropriation was only partial, that there would be no reduction or abatement in the amount of rent paid. The lessee insured the property and the lessee was to receive the difference between the insurance proceeds and the cost of restoration in the event of any casualty.

I am of the opinion that this case is controlled by the general principles announced in Helvering, Commissioner v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226. In that case, on documents and a state of facts quite similar to those above recited, the United States Supreme Court held that the transaction between the taxpayer and the trustee bank, in form a transfer of ownership with a lease back, was in truth and in fact a loan secured by the property involved and that the taxpayer should be treated as the owner of the property for all tax purposes, including depreciation. Counsel for plaintiff cite a good many cases on when the court should consider the transaction a mortgage, rather than a transfer of ownership. Such cases are not controlling under this factual situation. The government is *not contending* that the transac-

tion created a mortgage. Plaintiff relies on City National Bank Bldg. Co. v. Helvering, 1938, 68 App.D.C. 344, 98 F.2d 216; Akron Dry Goods Co. v. Commissioner, 18 T.C. 1143. Although counsel argue otherwise, I feel that the benefit of City National to plaintiff's position was destroyed by the decision of the Supreme Court in the Lazarus case. The Supreme Court, in its decision in Lazarus, calls attention to the fact that it granted certiorari by reason of the fact that a different result was reached in City National than in Lazarus. The Court then proceeded to affirm the decision of the Board of Tax Appeals in Lazarus. Therefore, I consider Lazarus to be the law on this case.

The Akron Dry Goods Co. v. Commissioner, supra, is of no help to the plaintiff. As a matter of fact, the decision in Akron actually supports the position of defendant in this case. I quote from the Tax Court opinion:

"* * * In treating the transaction as a sale in July 1928 resulting in a deductible loss the petitioner realized a substantial income tax benefit for the fiscal year 1929. Thereafter, the properties were not carried on petitioner's books as capital assets and thus were not taken into account in a question involving petitioner's insolvency in the subsequent taxable year 1936, hereinafter discussed.

"The record herein does not support a conclusion that the July 1928 transaction cast in the form of a sale, was, in equity, a mortgage as contended by petitioner. Furthermore, now to correct for the purpose of a claimed tax deduction benefit in the taxable year 1945 an alleged mistake, *but actually an inconsistent position,* which resulted in the petitioner's election to take a tax deduction benefit in the taxable year 1929 —a year as to which any adjustment is barred by the statute of limitation—would be contrary to the established principle of not allowing a double tax benefit. Robinson v.

Commissioner [5 Cir.], 181 F.2d 17, affirming 12 T.C. 246. Cf. Wheelock v. Commissioner [5 Cir.], 77 F.2d 474, affirming 28 B.T.A. 611."

Clearly, the decision in the Akron case is in full accord with the government's position in this court.

I hold that Syndicate was the owner of the bank building during the years in question. Counsel for defendant will prepare findings and judgment in conformity with this opinion.