TEXACO PUERTO RICO, INC., Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellee.

No. 595.    Decided April 11, 1963.

James R. Beverley, R. Castro Fernández, José López Baralt, and *William Estrella* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Arturo Estrella, Assistant Solicitor General,* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On July 2, 1947 the Secretary of the Navy, in representation of the United States of America, leased to several petroleum companies, among them appellant Texaco Puerto Rico, Inc., a parcel of land of approximately 190 cuerdas, its facilities and improvements including a pier known as the Cataño terminal or station, which was engaged in fuel storage.[1] A 20 year term of the contract was agreed, renewable

---

[1] In the premises contained in the contract it was stated that the "facilities" have never been activated by the government and require the outlay of approximately $100,000 for rehabilitation and overhaul; that the companies considered that the ordinary maintenance, repairs and replacements were estimated to be between $40,000 and $50,000 per annum; and that the companies contemplated the construction of additional "facilities" costing about one million dollars.

By virtue of an agreement of July 1948 the companies distributed

for 10 additional years, subject to the condition that the contract could be terminated at any time that the Secretary of the Navy determined that such action was necessary in the interest of the national defense.[2] The lessees could likewise revoke it provided each party gave a six-month notice in writing, and likewise any of the parties could withdraw from participation upon giving the same notice. The rental stipulated was fifteen thousand dollars per annum.

The rights and obligations of the parties in connection with the maintenance, repair and improvements of the property object of the lease were fixed by virtue of clauses 5-a, 6-a, 6-c, 7-b and 7-d of the contract, which read thus:

"5-a. The COMPANIES shall be responsible for normal protective maintenance of the facilities. . . . By normal protective maintenance is meant the taking of measures similar to those taken by commercial oil companies concerning their own capital assets to prevent fires, abnormal wear and tear or premature exhaustion due to carelessness or neglect.

"6-a. The COMPANIES shall have the right to repair, renew or replace (as distinct from its obligation to perform normal protective maintenance) any part of the facilities at their own cost and expense. . . . All such renewals or replacements in whole or in part of any of the physical capital assets of the FACILITIES as are made voluntarily by the COMPANIES shall remain the property of the COMPANIES and shall be considered as additional improvements and structures, and subject to the provisions of Clause 7-d.

"6-c. The COMPANIES may erect within the FACILITIES permanent improvements such as additional storage tanks, pipelines, warehouses, land offices, pump houses, sanitary facilities,

---

the leased facilities among themselves, a parcel of 53.36 acres corresponding to the appellant.

[2] On March 29, 1948 this clause 3-a was substituted and it was agreed that the government could terminate the contract (a) for nonperformance on the part of the lessees of the conditions and covenants of the contract; (b) in case a national emergency were decreed by the President or by Congress; and (c) in case the Secretary of the Navy should determine that the national defense so required, upon notice of 120 days.

railroad sidings, and other improvements convenient to the marketing of petroleum and associated products, or to facilitate the operation of the storage facilities and the ready receipt, discharge and delivery of petroleum and associated products in both bulk and packages. . . . All such additional improvements shall be kept free and clear of all liens and encumbrances of any kind whatsoever, and shall remain the property of the COMPANIES and may be removed by the COMPANIES at any time prior to expiration or cancellation of this contract, provided, however, that prior to such removal the COMPANIES will furnish the GOVERNMENT written notice of intention to remove and no removal will be accomplished without written statement of the GOVERNMENT that the GOVERNMENT does not elect to acquire title under Clause 7-d hereof.

"7-b. Upon the expiration of this contract, or of any renewal or extension thereof, or upon the exercise by the GOVERNMENT of the rights reserved in Clause 3-a hereof, the COMPANIES shall, upon demand by the GOVERNMENT, remove all structures and improvements and restore the premises to the same condition as that at the time existing when first it discharged its obligation under Clause 5-a hereof, normal wear and tear excepted.

"7-d. The GOVERNMENT shall have the right at the expiration or termination of this contract, or within a reasonable time thereafter, to take title to all structures and improvements placed upon the FACILITIES by the COMPANIES, and will pay the value thereof to the COMPANIES. The value of such structures and improvements is to be determined on the basis of off-site salvage value, less cost of restoration of the premises following removal. In the event no agreement can be reached as to the value of the structures and improvements, such value will be determined by a court of competent jurisdiction in accordance with the laws governing the acquisition of such property upon the basis aforementioned."

In order to avoid the seepage of fuel, during the year 1954 appellant performed certain work worth $18,229.47 on a gasoline tank. Since the tank was buried six feet deep, the earth covering it had to be removed. When it was opened it was found that the bottom had several plates perforated which could not be repaired because they were in such a

state of deterioration that they would resist welding. Seventy-two plates were removed and replaced giving the bottom of the tank a useful life of about four or five years. The capacity of the tank decreased. "Its new value would fluctuate between $175,000 and $200,000."[3]

In its income tax return for the year 1954 the appellant deducted the aforesaid amount of $18,229.47 as a necessary and useful expenditure of its business. The Secretary rejected the deduction and notified a deficiency; the taxpayer paid the deficiency assessed and petitioned refund. The trial court upheld the administrative decision and to that effect made the following conclusion of law:

"Neither the special improvements nor repairs made to the property in the nature of replacements to arrest its depreciation and appreciably prolong the life of the property, are deductible. Only the cost of incidental repairs which neither materially add to the value of the property nor prolong its life and which were made to keep the property in ordinary operating condition may be deducted. This is likewise applicable to leased property. 4 Mertens, Law of Federal Income Taxation, §§ 25.41 and 25.112 (1954). But as it is likewise indicated there (§ 25.41), the rule is very difficult to apply because it is not always easy to distinguish between an improvement or replacement of asset and an ordinary repair. However, the quantitative test which is used at times may be of some help to us. According to this test, for example, the repair of a door made isolatedly is considered a deductible expense, while the same repair, when involved in a rehabilitation plan of the property, is considered a capital improvement. *Id.*, § 25.41.

"Although it may give rise to some doubt, we conclude pursuant to the aforesaid quantitative test that the repair to the gasoline tank in 1954 was a special repair which could not be deducted as an expenditure. Such is not the case in 1955, which only involved keeping the railing in ordinary useful condition."

---

[3] Although oral evidence was introduced at the hearing, the appellant only designated part of the documentary evidence to complete the record on review. The respondent did not designate any additional evidence to be included. For that reason, in the statement of facts as to the nature of the work carried out we have gone by the findings made by the trial court.

We agreed to review the judgment rendered.

Appellant insists that the cost of the work carried out in the tank constitutes an admissible deduction to determine its net income because it is a necessary and useful expenditure in carrying on its business since (a) by virtue of the contract of lease it was bound to maintain it "in complete repair condition"; and (b) the government lessor retained the power to request the return of the tank at any time and to consider the contract terminated on any date, the lease, therefore, being one for a fixed term for the appellant corporation and without a fixed term for the government.

■ With respect to this last point it is evident from the preceding statement of facts that the oft-repeated contention that the contract was for a fixed term for the appellant does not correspond to the provisions of clauses 3-b and 3-c which we have copied and which permit the lessee company to revoke or withdraw the contract upon a six-month notice. The term of the lease is not apparently the controlling factor to determine whether the deduction lies as an ordinary expense. *Ehrlich* v. *Commissioner of Internal Revenue*, 198 F.2d 158 (1st Cir. 1952) illustrates what we have stated above. That was the case of a taxpayer who occupied a property under a lease of one year (1947) and after the expiration of that period, for an indefinite time until one of the parties should state its intention to terminate the lease by a written notice of thirty days. During the original stipulated term (1947), the lessee made expenditures in the sum of $7,366.34 in order to make the building suitable to be used as a warehouse. No notice of the termination of the contract was sent during the aforesaid year and the taxpayer continued occupying the building. The Court of Appeals for the First Circuit rejected the taxpayer's contention to the effect that since the original term had expired and he enjoyed possession of the premises as a tenant at will, these expenditures were wholly deductible during the year 1947 in which they were made. See, also, *George H.*

*Bowman Co.* v. *Commissioner of Internal Revenue*, 32 F.2d 404 (1929).

Be that as it may, the fundamental question before us is whether the sum of $18,229.47 constitutes a necessary and deductible expense, or whether, in default thereof, it is a capital expenditure. The applicable law is §§ 23(a)(1)(A) and 24(a)(2) and (3) of the Income Tax Act of 1954, 13 L.P.R.A. §§ 3023(a)(1)(A) and 3024(a)(2) and (3),[4] which provide:

Section 23(a)(1)(A):

"In computing net income there shall be allowed as deductions:

(a) *Expenses.—*

(1) *Trade or business expenses.—*

(A) *In General.—*All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including . . . rentals or *other payments*[5] *required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.*"

Section 24(a)(2):

"(a) *General Rule.—*In computing net income no deduction shall in any case be allowed in respect of:

(1) . . . ,

(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate;

(3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made;

---

[4] Equivalent to §§ 32(a)(1) and 33 in connection with 17(a)(2) and (3) of the Income Tax Act of 1924, 13 L.P.R.A. §§ 735, 736, and 696.

[5] It should be noted that in *Duffy* v. *Central R. Co.*, 268 U.S. 55, 64 (1924), it is stated that the phrase "other payments" should be construed as payments *ejusdem generis* with rentals, such as taxes, insurance, interest on mortgages, and the like, constituting liabilities of the lessor which the lessee has covenanted to pay.

(4) . . . ."

And in addition, §§ 23(a)–10(b) and 24(a)–2 of the Regulations, 13 R.&R.P.R. §§ 3023(a)–10(b) and 3024(a)–(2), which provide as follows:

Section 23(a)–10(b):

"The cost borne by a lessee in erecting buildings or making permanent improvements on ground of which he is lessee is held to be a capital investment and not deductible as a business expense.[6] In order to return to such taxpayer his investment of capital, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease, and such deduction shall be in lieu of a deduction for depreciation. If the remainder of the term of lease is greater than the probable life of the buildings erected, or of the improvements made, this deduction shall take the form of an allowance for depreciation."

Section 24(a)–(2):

"Amounts paid for increasing the capital value or for making good the depreciation (for which a deduction has been made) of property are not deductible from gross income."

■■ Mertens[7] sets forth the principal difficulty in connection with this question in the following words: "To find the dividing line between capital expenditures and repairs [ordinary] frequently presents an almost insoluble problem inasmuch as questions of degree are involved. Consequently, there is no dearth of fine distinctions in this area of the tax law. The line of demarcation between deductible repairs and additions to capital is, of course, obscure." Intrinsically the importance of the alternative between necessary expense and capital expenditure lies in that, if it is considered as a deductible expense, the amount of the tax is immediately available

---

[6] Section 22(b)(11) of Act of 1954, 13 L.P.R.A. § 3022(b)(11), excludes from the gross income "income, other than rent, derived by a lessor of real property upon the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee."

[7] 4 Law of Federal Income Taxation, § 25.41 (1960).

as current capital of operations, while if the expenditure is a capital item, the expense is recovered merely by the depreciation of the asset during a number of years. In addition, upon disposing of the capital asset the portion not depreciated of the capital expenditure reduced the capital net income which, as we know, receives a more favorable treatment in the imposition of the tax rate than that which is applied when it is a mere ordinary deduction.

■■ However, it may be stated that the determination on the particular point rests basically on the nature, character and purposes of the expenditure. *Deputy* v. *DuPont*, 308 U.S. 488 (1939).[8] The terms and covenants governing the leasehold relationship have been considered mostly by the courts as an element for the purpose of determining the right of the *lessor* in claiming a deduction for depreciation. Thus, when the lessee is bound to return the leased property in the same condition in which he received it, as a general rule the lessor is denied deduction for depreciation in view of the fact that under the contract he is guaranteed that he shall suffer no loss with respect to his investment. *Gulf M. & N. R. Co.* v. *Commissioner of Internal Revenue*, 83 F.2d 788 (5th Cir. 1936); *Atlantic Coast Line R. Co.* v. *Commissioner of Int. Rev.*, 81 F.2d 309 (4th Cir. 1936); *Georgia Ry. & Electric Co.* v. *Commissioner of Int. Rev.*, 77 F.2d 897 (5th Cir. 1935). See, however, *North Carolina Midland Railway Co.* v. *United States*, 163 F.Supp. 610 (Ct. Cl. 1958), commented in 57 Mich. L. Rev. 1252 (1959). A contrario sensu, up to the point where the lessee has made a capital ex-

---

[8] In general, Graves, *Capital Expenditures v. Current Deductions*, 37 Taxes 1126 (1959); *Distinction Between Capital Expenditures and Expenses for the Conservation of Property Held for the Production of Income*, 13 Wyo. L.J. 149 (1959); *Repairs Expense Versus Capital Expenditures*, 13 Tax L. Rev. 231 (1958); *Basis Criteria for Distinguishing Revenue Charges From Capital Expenditures in Income Tax Computations*, 49 Mich. L. Rev. 213 (1950); and Note, 47 Harv. L. Rev. 669 (1934).

For a complete discussion of the question, see Wriggins and Gordon, Repairs vs. Capital Expenditures, The Ronald Press Co. (1958).

penditure he is authorized *to represent the depreciation* as a deductible expense whenever it was made in compliance with the obligations under the contract, *Weiss* v. *Wiener*, 279 U.S. 333 (1929); *Reisinger* v. *Commissioner of Internal Revenue*, 144 F.2d 475 (2d Cir. 1944); *City Nat. Bank Bldg. Co.* v. *Helvering*, 98 F.2d 216 (1938); *Cogar* v. *Commissioner of Internal Revenue*, 44 F.2d 554 (6th Cir. 1930). If the obligation assumed by the lessee is that of making merely ordinary repairs, it is clear that the lessor may include the depreciation of the property leased as a deductible expense. *Richmond Belt R. Co.*, 13 B.T.A. 1291 (1928). There exists, however, a conflict on whether this deduction may be made *by the landlord* whenever the tenant has agreed to repair, renew and replace the assets leased without expressly assuming the obligation of returning them in the same condition in which they were received. *Alaska Realty Co.* v. *Commissioner of Internal Revenue*, 141 F.2d 675 (6th Cir. 1944); *Terminal Railroad Association of St. Louis*, 33 B.T.A. 906 (1936). We therefore see that the terms of the contract are relevant when a deduction is claimed *by the landlord* (and certainly only as depreciation, never as a necessary expense), but not when, as in the present case, the taxpayer is the lessee, since the contractual obligations assumed by the lessee with respect to conservation and maintenance mainly operate to reduce or eliminate the losses that the landlord may have had due to the obsolescence or exhaustion of the property. Annotation, *Federal Income Tax: Right of Lessor or His Successors to Deduction for Depreciation, Obsolescence, or Exhaustion*, 40 A.L.R.2d 440 (1955).

▮▮ In general terms, the test used to decide whether it is a capital expenditure or an ordinary expense was stated since 1926 in *Illinois Merchants Trust Co., Executor*, 4 B.T.A. 103, thus:

"The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but

keep it in an ordinarily efficient operating condition, may be deducted as expense . . . . Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property should be charged against the depreciation reserve."

As it may be noted, the most important factor is the prolongation of the usefulness of the property. Although each case should be examined separately on the basis of its specific circumstances, as a general rule it is accepted that this prolongation is appreciable when the use extends over the term of one year. *Hotel Kingkade* v. *Commissioner of Internal Rev.*, 180 F.2d 310 (10th Cir. 1950). Another factor to be considered is the increase in value of the property. *Fidelity Storage Corporation* v. *Burnet*, 58 F.2d 526 (1932) ; Shugarmen, *Basic Criteria for Distinguishing Revenue Charges From Capital Expenditures in Income Tax Computations*, 49 Mich. L. Rev. 213 (1950).

Appellant relies with marked emphasis on the case of *Journal Tribune Publ. Co.* v. *Commissioner*, 216 F.2d 138 (8th Cir. 1954), to maintain that since it was bound under the contract to keep the tank "in complete repair condition," the expenditure is, then, deductible, irrespective of its nature, character and purpose. In effect, in said case it is held that where the lease requires the lessee to keep up the leased property, cost of machinery and equipment which lessee purchased to replace worn out and discarded machinery and equipment which had been part of the leased property was deductible by lessee as an ordinary expense, even though purchased machinery and equipment had a useful life in excess of one year. Although the facts involved in this case were similar to those in the case at bar, which they are not, the view expressed therein does not convince us because it disregards the basic principles set forth—the deductible character depends on the nature and purpose of the expenditure and the contractual conditions are only significant for the purpose

of determining whether an allowance of deduction for depreciation may be allowed—and general practices of the science of accounting.[9] Furthermore, reduced to its ultimate expression the rule laid down in *Journal-Tribune* would permit the deduction of any expenditure made by the lessee, regardless of its amount or nature, provided it was made in compliance with contract obligations. This would entirely defeat the purpose of the Act in permitting the deductions, which is none other than that the ordinary income should have a close and intimate relation with ordinary expenses incurred to obtain said income.

As we anticipated in the preceding paragraph, the situation of facts in the case of *Journal-Tribune* may be readily distinguished from the case at bar, for there the lessee is not only authorized to sell or otherwise dispose of the equipment and machinery included in the lease, but was also bound to substitute it by new or additional units, which ipso facto became part of the property under the lease without the lessee having right to any compensation whatsoever. This is not the contractual relation existing between the appellant and the government. From the clauses copied at the beginning of this opinion it evidently appears that with the exception of the "normal protective maintenance of the facilities" to prevent fire and extraordinary wear and tear and premature exhaustion due to carelessness or neglect—none of these situations is present in this suit, at least as may be inferred from the findings of fact of the trial court—when it is sought to renew or replace the facilities, the lessee re-

---

[9] The other cases cited by appellant—*Illinois Central R. Co.* v. *Commissioner of Internal Revenue*, 90 F.2d 458 (7th Cir. 1937) and *Atlantic Coast Line R. Co.* v. *Commissioner of Internal Rev.*, 81 F.2d 309 (4th Cir. 1936)— involve a particular retirement system of accounting which is permissible in the cases of railroads and which is not strictly applicable to the facts at bar. Furthermore, we cannot overlook the fact that they pursue a definite policy to encourage the speedy development of an efficient national system of communications. Within the Puerto Rican picture all companies do not need special protection, nor is it justified.

tains the title thereof, subject to the right of the government to acquire them upon making the corresponding payment, as established in clause 7-b. Since appellant retained ownership of these assets, how can it allege that if they prolong its use and increase its value they do not constitute capital expenditures subject to annual depreciation or to a deduction for exhaustion?

■ This brings us to the final point of the question. From the scarce elements of proof at our disposal we infer that the "repair" made had two consequences: (1) it prolonged from four to five years the useful life of the tank; and (2) its "new" value fluctuates between $175,000 and $200,000. In the absence of specific evidence on the value and estimate of useful life of the tank before and after the repair, and considering the findings of fact and the final conclusion of the trial court, we can infer that both increased. This being so, it must be maintained that the expense of $18,229.47 constituted a capital expenditure, and not an ordinary expense wholly deductible in the year in which it was made. The trial court did not err in holding that said item was not deductible as an ordinary and necessary operating expense. However, appellant should be allowed for this tax year a deduction under § 23(a)(10)(b) of the Regulations, *supra*, for the purpose of reimbursing it for its capital investment. This deduction is equal to the total amount invested divided by the remaining term of the lease. Insofar as the 1954 tax year is concerned, the deduction should be made in the corresponding proportion from the date the expense was made. Since we do not have evidence on this fact we shall remand the case to the trial court for the appropriate determination, and for which it should receive the necessary evidence.

Judgment will be accordingly entered.