The F. and R. Lazarus and Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 69481, 69750.   Promulgated May 17, 1935.

*H. A. Mihills, C. P. A., Harry Stickney, Esq.,* and *Robert P. Goldman, Esq.,* for the petitioner.

*Philip M. Clark, Esq.,* and *Stanley B. Pierson, Esq.,* for the respondent.

### OPINION.

Seawell: These proceedings were consolidated for hearing and report and involve the redetermination of deficiencies in income tax in the amounts of $3,084 and $10,349.43 for the fiscal years ending January 31, 1930 and 1931, respectively.   The two issues involved relate to the right of the petitioner to take depreciation on certain buildings it occupied during the taxable years under a 99-year lease, and to deduct as ordinary and necessary business expenses contributions to certain charitable institutions.

The petitioner, an Ohio corporation organized in 1851, operates the largest department store in Columbus, Ohio.   In 1928 it was conducting its business in three buildings which it had previously constructed at an aggregate cost of $2,467,952.57.   Two of the buildings were erected on ground then owned by the petitioner in fee, and the third building, erected in 1921 at a cost of $258,054.71, was constructed on ground held by the petitioner under a 99-year lease, with option to purchase, acquired in 1915.   It also held another parcel

of ground under a 99-year lease with option to purchase. In 1928 the petitioner, in a transaction involving the borrowing of money, gave to the Huntington National Bank of Columbus, trustee, a deed to the property it held in fee, and assignments of the property it held under 99-year leases. Concurrently with such conveyance and assignments, the trustee leased all of the property to the petitioner for 99 years, renewable for like periods, with an option to purchase the parcels to which it had title. In its returns for the taxable years the petitioner claimed depreciation on the three buildings based upon a useful life of 40 years. The respondent disallowed the claimed deductions on the ground that the right to take depreciation on the property followed the legal title thereto. The petitioner insists that the deed was in reality a mortgage.

It is not essential that the taxpayer claiming a deduction for depreciation be the owner of legal title to the property. In *Duffy* v. *Central R. Co. of New Jersey*, 268 U. S. 55, the railroad company was allowed to take depreciation on property constructed by it on land occupied under a 999-year lease even though the lessor had title to the betterments, which had a useful life less than the remaining term of the lease. The purchaser of the interest in a 99-year lease is entitled to take depreciation on property erected on the land by the original lessee. *Cogar* v. *Commissioner*, 44 Fed. (2d) 554, reversing 16 B. T. A. 374. Cf. *Military Equipment Co.*, 2 B. T. A. 36; *Frank Holton & Co.*, 10 B. T. A. 1317. We have said that "The important question is not, in whom vests the fee or when it vested, but who made the investment of the capital which is to be recovered over a period of the exhaustion of the property. The one who made the investment is entitled to its return." *Gladding Dry Goods Co.*, 2 B. T. A. 336. In *Rankin* v. *Commissioner*, 60 Fed. (2d) 76, affirming 17 B. T. A. 1301, on the point, it was held that certain agreements were not leases with an option to purchase, but contracts of purchase, and Rankin was allowed to deduct amounts for depreciation on improvements made on the property. In its opinion the court said: "It is not necessary, in a case of this kind, that the taxpayer be the owner of the legal title. It is sufficient if it appears that his use or occupancy will exceed the life of the improvement."

It is well established that a deed, absolute in form, will be treated by a court of equity as a mortgage if it is executed as security for a loan of money. *Peugh* v. *Davis*, 96 U. S. 332; *Coleman* v. *Miller*, 8 Ohio, (Reprint) 179; *Cotterell* v. *Long*, 20 Ohio, 464; *Bailey* v. *Poe*, 120 Atl. (Md.) 242; *Helmbold* v. *Helmbold*, 158 N. E. (Ohio) 499; *Obrecht* v. *Friese*, 129 Atl. (Md.) 657. In doubtful cases, courts construe the transaction as a mortgage. *Russell* v. *Southard*, 53 U. S. 138. The right of the petitioner to take depreciation on the

property in question turns upon whether the transaction occurring in 1928 created the relation of buyer and seller or lender and borrower.

In 1928 the petitioner had a mortgage of $1,700,000 outstanding on the property it owned in fee and owed slightly more than $1,500,000 for money borrowed on short-term notes, and sought means of spreading the obligations over a longer period of time. The only avenue open to it was the equities it had in its real property. A banking house in Chicago, the holder of petitioner's short-term notes, suggested a loan of $3,750,000 for 25 years at 5 percent interest secured by a mortgage on petitioner's real property, conditional upon the purchase of the notes at 97.25 and the creation of a sinking fund, which, with interest on the loan and trustee expenses, would have involved an outlay of $210,000 per year. The Huntington National Bank of Columbus, one of petitioner's bankers for about 15 years, suggested a loan of $3,500,000 at 5 percent based upon the issuance of land trust certificates on petitioner's real property at a price of 96.75, and the creation of a sinking fund for repayment of the loan. The proposal of the Huntington National Bank of Columbus, limited to $3,250,000 in amount, was accepted by the petitioner because the loan to be made under it was self-liquidating.

The transaction was closed in this manner: The petitioner executed and delivered to the Huntington National Bank of Columbus, trustee, a deed to the parcels of property it held in fee and assignments of the 99-year leases it held for the remaining property, and concurrently therewith the trustee leased the property to the petitioner for a term of 99 years, with an option of renewal for like terms and to purchase at specified prices, and executed a declaration of trust between itself and holders of the land trust certificates relating to the issuance of 3,500 certificates, each of the face amount of $1,000. Of the 3,500 certificates, 250 were held in reserve pending the exercise of the option to purchase the parcels covered by the 99-year leases assigned to the trustee by the petitioner. The sum of $3,159,687.50 ($3,250,000 less discount of 3.25 percent) was received by the petitioner from the Huntington National Bank of Columbus under the transaction. This sum was used by the petitioner to take up its mortgage on the property and short-term notes. The release of the mortgage, the deed to the trustee and the declaration of trust were recorded consecutively on June 28, 1928.

The lease from the trustee to the petitioner provides, among other things, for annual rentals during the term of the lease based upon an annual return of 5 percent on $3,250,000; that the lessee shall create a depreciation fund and make quarterly payments to the trustee for deposit therein until the fund reaches the sum of

$2,600,000, and that such obligation may be satisfied by the delivery of cash, land trust certificates issued under the declaration of trust, or obligations of the United States; that the lessor shall pay interest on the amounts deposited in such fund, provided that any amounts may be, at the request of the petitioner, invested in obligations of the United States or certificates issued by the trustee under its declaration of trust; that the lessee shall have the option to purchase the lessor's interest in the property for $3,605,000 between June 1, 1933, and May 31, 1938; for $3,570,000 between June 1, 1938, and May 1, 1948; for $3,535,000 after June 1, 1948, plus, in each case, accrued rentals to the date of purchase; that in case the option to purchase is exercised there shall be credited on the purchase price (1) all amounts then in the hands of the lessor as trustee not otherwise due for distribution under the terms of the trust agreement with the certificate holders, (2) any amounts in the hands of the lessor received as compensation for the appropriation to public use of any part of the premises, (3) the amount of cash in the depreciation fund, including the net proceeds of any securities other than land trust certificates, and the option price of any land trust certificates held in the depreciation fund, and (4) the net unappropriated proceeds of any insurance; that the lessee shall pay all taxes and other charges on the depreciation fund; that in case the lessee fails to exercise the option to purchase or the lease is terminated on account of default of the lessee, the depreciation fund shall become the property of the lessor as liquidated damages on account of depreciation in value of the premises; that in case of condemnation of a substantial portion of the premises the lessee shall exercise the option given it to purchase; that there shall be no diminution of rent in case of condemnation or loss by fire of any portion of the premises; and that the lessee shall pay all taxes and insurance on the property and keep it in good condition, order and repair.

The land trust certificates were sold to the public at $1,010 to yield a return of 4.95 percent. The certificates recite, among other things not important here, that the holder is the owner of a portion, stated in 3,500ths, " of the equitable and beneficial interest " in the real property under lease to the petitioner; that the trustee will account to the registered owner of the certificate quarterly for the owner's proportionate share of the trust estate or the net proceeds thereof; and that the certificate is subject to all of the terms of the declaration of trust under which it was issued.

The declaration of trust executed by the trustee, in addition to the terms of the certificates as set forth in the preceding paragraph, recites the terms of the option to purchase given the petitioner under

the lease; that the certificates are subject to call at prices ranging from $1,010 to $1,030, depending upon the period during which the right is exercised, plus an adjustment for accrued rentals; that in the event the property is sold distribution of the net proceeds shall be made among the holders of the certificates; that the duties of the trustee shall be restricted to the collection of rent from the trust estate and the distribution of the net proceeds thereof to the certificate holders; and that the holders of the certificates shall have no right to call for a partition of the trust estate.

From the undisputed testimony in the record it is clear that the petitioner's desire was to obtain a long-term loan on the security of its real property, with provision for reacquisition of unencumbered title. It was not interested in selling the property to raise the needed funds. The petitioner then considered the property conveyed to be worth around $6,000,000 and it would not have sold it for $3,250,000, the face amount of the trust certificates actually sold. The representative of the bank in the transaction testified that he did not consider that the bank was buying the property, and that the deal was merely one involving a loan with ample security. The bank had the property appraised to determine not whether the property was worth $3,250,000 to it as a buyer, but to establish the value of the land and improvements for loan purposes. The appraisal made by qualified appraisers established a value of $3,453,125 for the land and $3,056,427 for the improvements as of the time of the transaction.

The transaction was carried out in the form described instead of by a mortgage loan because of the lack of a market at that time for mortgage notes. The annual rentals were fixed on the basis of a 5 percent return on the face amount of the outstanding certificates, an amount established by evidence to be less than a fair rental. This the petitioner recognized by making a rent charge of $375,000 in its books each year for the property. The option price of the property held in fee was fixed at an amount equal to the call price of the outstanding certificates and the amount of the quarterly payments into the depreciation fund is sufficient to retire all of the certificates within 48½ years at the call prices thereof. Up to this time the petitioner has been able to meet the requirements of the fund with certificates purchased in the open market at less than the call prices and now has on hand certificates of a face amount sufficient to meet its depreciation fund obligations for sixteen years. The petitioner desired to have the lease provide for a depreciation fund equal to the option price of the property, but it was limited to $2,600,000 in the lease in order to bring the transaction within a certain ruling of the Attorney General of Ohio.

From a consideration of all the evidence we conclude that the deed given was in reality a mortgage, and that the transaction was not

one in which the petitioner lost its right to deductions for exhaustion of the property conveyed. The right of the petitioner to exhaustion on the improvements it made in 1921 on the property then occupied by it as the original lessee under a 99-year lease is controlled by *Duffy* v. *Central R. Co. of New Jersey, supra.* These holdings are not contrary to *Weiss* v. *Wiener*, 279 U. S. 333. In that case, as the court pointed out in *Cogar* v. *Commissioner, supra*, Wiener took the lease with the buildings and had no investment in the property to recover.

Of the qualified witnesses produced by the petitioner to express an opinion on the point, one testified that the property in question had a useful life of from 40 to 50 years; another, 45 to 50 years; another, 40 years; and the fourth, 60 years. From their testimony we find that the property has a life of 50 years for depreciation purposes. Exhaustion will be computed at the rate of 2 percent per annum on a cost basis of $2,467,952.57.

The petitioner's vice president and treasurer, Fred Lazarus, Jr., assisted in the organization of the Columbus Community Fund. He has always actively participated in its affairs and been a member of its executive committee, and with another individual was responsible for obtaining the larger contributions to the fund. About 50 agencies derive their funds from the Columbus Community Fund.

During the taxable years the petitioner employed between 1,400 and 1,600 employees and was either the largest or the second largest employer of labor in Columbus, a city having a population of about 300,000. It employed two full-time nurses and had a physician subject to call.

A survey made in 1928 by the Columbus Community Fund disclosed that about 20 percent of the petitioner's employees or members of their families were in active contact with social and health agencies deriving their funds from the Columbus Community Fund. Surveys made relating to employees of an undisclosed number of other concerns engaged in various kinds of business disclosed that not less than 15 percent of the employees of any concern were receiving benefits from such agencies. Of a group of 199 employees of petitioner investigated by the Columbus Community Fund in 1928, 35 of them or members of their families were known to the family welfare agencies of the Columbus Community Fund. Of these, 17 were known to the agencies in the health group, 4 to such agencies and the family care group, 3 to the health group and the protective and corrective group, 4 to the health and family groups and also to agencies of the protective and corrective group, and 7 to the family care group. These agencies do not include neighborhood houses, character building or recreational organizations, or hospitals,

except the Children's Hospital and White Cross Hospital. Contributions to the fund were solicited from employers of labor on the basis of the results shown by these investigations.

The facilities and services of the organizations supported by the Columbus Community Fund were available to all citizens of Columbus, no preference being given employees of the petitioner.

The Columbus Community Fund considered $10 per employee to be the minimum amount concerns in Columbus should contribute under normal business conditions. The amount was subsequently increased to take care of additional demands upon the agencies deriving their income from the fund. During the taxable year the petitioner made the following contributions to the organizations shown:

|  | 1930 | 1931 |
|---|---|---|
| Columbus Community Fund | $18,000 | $18,166.67 |
| Salvation Army | 1,000 | 1,000.00 |
| White Cross Hospital | 1,000 | 1,000.00 |

The petitioner believed that the agencies of the Columbus Community Fund, the White Cross Hospital, and the Salvation Army in Columbus helped make the city a better place in which to live, thereby increasing its opportunities for business, and that by showing its willingness to bear its share of the cost of such work it created the good will of its customers. The petitioner made no special effort to obtain publicity in connection with its contributions. Its contributions to the agencies have always been among the largest in the community, and because of that fact they received a considerable amount of publicity. The petitioner was also of the opinion that failure to make contributions to these agencies would have resulted in loss of patronage from enthusiasts of social service work of the kind being conducted by the agencies.

Article 264 of Regulations 74 provides that:

Donations made by a corporation for purposes connected with the operation of its business, * * * when limited to charitable institutions conducted for the benefit of its employees or their dependents are a proper deduction as ordinary and necessary expenses. Donations which legitimately represent a consideration for a benefit flowing directly to the corporation as an incident of its business are allowable deductions from gross income.

Under these regulations, which have the force of law, the petitioner must show a direct benefit to its employees or business in order to be entitled to deduct the donations in question as an ordinary and necessary business expense. *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289.

The petitioner claims to be within the statute on the ground that its employees received some benefit from the services of the agencies deriving their operating funds from the organization to which the contributions were made and that failure to make payments would have resulted in serious loss to its business.

An investigation conducted in a prior year disclosed that some of the petitioner's employees and members of their families had taken advantage of the facilities of some of the various charitable and other agencies receiving support from the Columbus Community Fund. Whether the same situation prevailed in the taxable years does not appear, but the argument of counsel assumes that it did. The nature of the petitioner's business is such that it required the services of persons of various types and walks of life and it is not regarded as unusual that out of a large group a portion should, of necessity or otherwise, seek the benefits of welfare agencies. The contributions made by the petitioner did not give its employees any better standing before the various organizations receiving support from the Columbus Community Fund than other citizens of the community, and it does not appear that a contribution by the employer of an applicant for help, if employed, was a prerequisite to the rendition of assistance. The petitioner's vice president and treasurer had played a prominent part in the affairs of the Columbus Community Fund since its inception, and the petitioner considered itself under a moral obligation to contribute to a cause receiving the active public support of one of its high officers. Obviously, there could have been no division of sentiment. In making the contributions, we think the petitioner was motivated by philanthropic rather than business reasons.

The petitioner did not seek the publicity its contributions received. While failure to contribute would have resulted, as Fred Lazarus, Jr., testified, in loss of patronage of " a good many people who are almost fanatical on the subject of social service of this kind ", it may be that some loss of business occurred from participation in the creation of the fund, for there are at times critics of the best of good deeds and wide difference of opinion as to how funds for charitable purposes should be raised and spent. It also may be true that the petitioner had patrons who believed that it should have contributed a larger amount and refrained from dealing with petitioner on account of their views. Contributions made to charitable institutions for the purpose of avoiding criticism or ill will are not deductible as ordinary and necessary business expenses. *W. M. Ritter Lumber Co.*, 30 B. T. A. 231 (271), in which contributions claimed to be deductible were made to the Columbus Community Fund.

The petitioner cites a number of cases as authority for sustaining its claim, but relies chiefly on *Evening Star Newspaper Co.*, 28

B. T. A. 762. In that case, as was pointed out in *W. M. Ritter Lumber Co.*, *supra*, the existence of the petitioner was dependent upon the " general opinion and esteem of the public within its circulation radius." No such fact exists here.

Claims of the sort involved here are controlled by their peculiar facts. *Old Mission Portland Cement Co.* v. *Helvering*, *supra*. From the evidence here we are unable to find as a fact that the contributions resulted in any direct benefit to petitioner's employees or its business, and, accordingly, sustain the action of the respondent in refusing to allow the several amounts as ordinary and necessary business expenses.

*Decision will be entered under Rule 50.*