J. LEONARD SCHMITZ AND ALICE SCHMITZ, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
ALBERT H. THRONDSON AND DORIS G. THRONDSON, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1881-67, 1967-67. Filed December 2, 1968.

---

*Richard Saveri* and *Stephen J. Schwartz*, for the petitioners in docket No. 1881-67.

*Michael Traynor*, for the petitioners in docket No. 1967-67.

*Robert M. Zimmerman*, for the respondent.

FORRESTER, *Judge:* In these consolidated cases, respondent has determined deficiencies in petitioners' income taxes for the calendar year 1963 as follows:

| Docket No. | Petitioners | Deficiencies |
|---|---|---|
| 1881-67 | J. Leonard Schmitz and Alice Schmitz | $5, 615. 60 |
| 1967-67 | Albert H. Throndson and Doris G. Throndson | 11, 740. 96 |

In docket No. 1967-67 a casualty loss adjustment, set forth in the statutory notice of deficiency, has been disposed of by agreement of the parties, consequently the sole remaining issue left for decision is whether the payment of $36,000 by J. Leonard Schmitz to Albert H. Throndson was for Throndson's covenant not to compete with Schmitz in the practice of oral surgery, for Throndson's sale of goodwill to Schmitz, or was attributable in part to each. The petitioners' respective contentions regarding the transaction are in direct opposition to one another.

Respondent has taken inconsistent positions. In the Schmitz case respondent has determined that there was a purchase of goodwill and in the Throndson case he has determined that there was a sale of a covenant not to compete. Respondent does not seek to sustain the deficiencies as to both parties in full. He seeks only to have the $36,000 paid to Throndson by Schmitz treated uniformly by both parties.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference and adopted as part of our findings.

J. Leonard Schmitz (hereinafter sometimes referred to as Schmitz) and Alice Schmitz, petitioners in docket No. 1881-67, are husband and wife whose residence was Kentfield, Marin County, Calif., when their petition was filed. They filed a joint Federal income tax return for the 1963 calendar year with the district director of internal revenue, San Francisco, Calif.

Albert H. Throndson (hereinafter sometimes referred to as Throndson) and Doris G. Throndson, petitioners in docket No. 1967-

67, are husband and wife whose residence was Woodside, San Mateo County, Calif., when their petition was filed. They also filed a joint Federal income tax return for the 1963 calendar year with the district director of internal revenue, San Francisco, Calif. Schmitz and Throndson are both dentists specializing in the practice of oral surgery. Both doctors belong to local and national professional dental societies. Throndson was 61 years old at the time of the trial herein in January 1968.

From 1946 through 1962, Throndson and Schmitz were equal partners in the practice of dentistry (hereinafter sometimes referred to as the partnership). A written partnership agreement was first consummated by them on May 15, 1951, and subsequently modified on September 21, 1955, and February 20, 1956.

The practice of the partnership was exclusively from referrals by other dentists, medical doctors, and from patients. Referral slips were printed up by the partnership for the convenience of the referring doctors. Patients were generally referred to the firm rather than to either of the individual doctors personally and any given patient might be treated by either doctor. If the procedure required more than one visit the patient was often treated by both Schmitz and Throndson on the successive occasions.

At the commencement of the partnership in 1946, both Schmitz and Throndson practiced in one office in San Francisco, Calif. Schmitz resided in San Francisco and Throndson resided in Woodside. In 1950 Schmitz moved to Kentfield in Marin County, Calif.

On or about June 8, 1953, the partnership opened an additional office on Greenfield Avenue, San Rafael, Marin County, Calif. This office was rented by the partnership. In December of 1957 Schmitz and Throndson purchased land and built an office building on Fifth Avenue in San Rafael, and the practice on Greenfield Avenue was then moved to the new building on Fifth Avenue. This building and the land upon which it was constructed was jointly owned by Schmitz and Mrs. Schmitz and Throndson and Mrs. Throndson at all times prior to the termination of the partnership in 1962.

Both Schmitz and Throndson treated patients at both the San Rafael and San Francisco offices. Since Schmitz lived in San Rafael he practiced 3 days of a 5-day week at the San Rafael office; the other 2 days he practiced at San Francisco. Throndson did exactly the opposite. All records relevant to the San Rafael practice were kept at the San Rafael office.

The net profits from both offices of the partnership for the years 1958 through 1962 were as follows:

NET PROFIT

| Year | San Francisco | San Rafael |
|---|---|---|
| 1962 | $15, 079. 45 | $33, 968. 38 |
| 1961 | 14, 728. 94 | 35, 549. 04 |
| 1960 | 15, 189. 09 | 31, 836. 31 |
| 1959 | 14, 685. 03 | 29, 545. 47 |
| 1958 | 14, 937. 02 | 28, 393. 53 |

Toward the end of 1962, Schmitz and Throndson had a disagreement over the effort being expended by each party and Throndson suggested an adjustment in their financial arrangement. An adjustment was unacceptable to Schmitz and he suggested that the partnership dissolve. As a result of this discussion Throndson retained Edward J. Reidy (hereinafter sometimes referred to as Reidy) as his attorney. Throndson did not execute either a power of attorney or a written contract of employment with Reidy. A covenant not to compete was never discussed between Throndson and Reidy.

Schmitz retained Joseph L. Alioto (hereinafter sometimes referred to as Alioto) as his attorney. Schmitz stated to Alioto that it was his "firm intention" to continue practicing in Marin County.

On Tuesday, December 11, and Friday, December 14, 1962, both Schmitz and Throndson and their respective attorneys met in the offices of Alioto for the purpose of dissolving the partnership. At the December 11 meeting both Schmitz and Throndson expressed a desire for the Marin County practice in San Rafael. Alioto mentioned an agreement for Throndson not to practice in Marin County if Schmitz were to get the practice at San Rafael, but because Schmitz had previously stated that it was his "firm intention" to continue to practice in Marin County, regardless of what happened, the parties did not discuss the matter further or attempt to negotiate a covenant not to compete. The December 11 meeting was inconclusive because of friction between the doctors. Neither at such meeting nor at any other time, did Throndson define the extent of Reidy's authority.

At the second meeting held in Alioto's office on Friday, December 14, Reidy did not take an active role in the discussions. For the purpose of negotiations Throndson had obtained appraisals on the San Rafael Medical Building supporting a value of $127,000 and a loan value of $80,000. Schmitz had obtained an appraisal supporting a value of $100,000 (a net value of $68,000, since the property was encumbered by a $32,000 mortgage) from the bank in which his brother-in-law was a manager.

Throndson stated at the December 14 meeting that he would allow Schmitz to take the entire building and the Marin County practice at San Rafael, on payment of $90,000, but that if Throndson were to take the entire building and the Marin County practice, he would only be willing to pay $50,000.

Throndson's explanation for the difference between these bid and asked prices was that Alioto had previously stated that: (1) His client, Schmitz, would under no circumstances leave Marin County or the practice of dentistry there; (2) had stated further that if Throndson were successful in outbidding Schmitz for such building and practice, Schmitz would exercise an option he had already taken on another space and continue to practice in San Rafael and (3) Schmitz, if successful in the bidding, would have the advantage of the building and established goodwill in the form of an uninterrupted practice.

Throndson's proposal for $90,000 was rejected by Schmitz. Throndson then argued, in the negotiations, that there was an element of goodwill attributable to the continuity of practice and the established referrals. It was believed by Throndson that the referrals would continue for sometime at San Rafael even if one of the doctor's names were to be deleted from the partnership.

Alioto finally conceded that there was some element of goodwill present and therefore suggested that another meeting be tentatively scheduled for the following Friday, at which time Schmitz and Throndson would come prepared to bid, with the lowest bidder having the first option to rebid, alternate rebidding to continue in increments of at least $1,000 until one party dropped out.

On Saturday, December 15, 1962, the day after the second meeting, Reidy, who was at his office, received a telephone call from Alioto who informed him that he had been authorized by Schmitz to submit a bid of $70,000: $34,000 immediately and $12,000 a year for 3 years.

Alioto also stated that Schmitz would retain the accounts receivable and equipment at San Rafael and Throndson would retain the accounts receivable and equipment at San Francisco, cash in the bank would be divided equally, and adjustment was to be made between the doctors for the differential in hours worked by each of them in 1962.

Shortly after receiving Alioto's telephone call, Reidy telephoned Throndson and informed him of the offer. Throndson, after a brief discussion with his wife, told Reidy to accept it.

Either before or after Alioto called Reidy, on Saturday, December 15, 1962, Alioto contacted Schmitz and told him that he (Schmitz) would pay $34,000 for Throndson's interest in the real property and $36,000 over a 3-year period for a covenant not to compete. Schmitz at first thought that this amount was excessive, however, Alioto explained that while it was a large amount of money, Schmitz would have the sole right to practice without competition from Throndson in Marin County, and that the agreement not to compete would be tax deductible.

After Alioto explained to Schmitz the tax effects of a covenant not to compete Schmitz said: "Well, if that is the case, this sounds all right with me. Go ahead and see what you can do as far as contacting Throndson and Reidy and getting a formal agreement."

Sometime on Monday, December 17, 1962, Reidy telephoned Alioto and informed him that his client, Throndson, had agreed to the terms of the offer, that is, Schmitz would be given the building (subject to the mortgage) and the practice at San Rafael, while Throndson would keep the San Francisco practice and also receive a total of $70,000 from Schmitz, $34,000 being paid immediately, with the $36,000 remainder being paid at $12,000 a year over the next 3 years.

Alioto then asked Reidy to draft a letter confirming the terms of the agreement and stating that the $12,000 a year for 3 years be spe-cifically included in the letter as payment for a covenant not to com-pete. Reidy was led to believe by Alioto that this letter was to be used to assist Alioto's client in arranging financing.

Reidy was unaware of the tax consequences of allocating a part of the purchase price to a covenant not to compete and agreed to Alioto's request. He did so because he believed that the letter was to be used in assisting Schmitz in financing the transaction, although he did not know why this would be so, and also because Throndson had indicated to him, after the second meeting, that he preferred to practice in San Francisco. Reidy then wrote and mailed the following letter:

DECEMBER 17, 1962

MR. JOSEPH ALIOTO,
*Attorney at Law,*
*111 Sutter Street,*
*San Francsco 4,*
*California.*
DEAR MR. ALIOTO:

This is to confirm the terms of the settlement of the partnership termination of Doctors Throndsen [sic] [1] and Schmitz.

Dr. Schmitz will pay $34,000.00 for Dr. Throndsen's interest in the real property and $12,000.00 per year payable January 2, 1963, 1964 and 1965 for a covenant for Dr. Throndsen not to practice in Marin County.

Dr. Throndsen will also take the San Francisco practice together with the accounts receivable therein. Dr. Schmitz will have the practice and accounts receivable in San Rafael.

It is understood that the cash in the bank will be divided equally and that no expenditures will be made from either office pending the termination of the partnership which will probably conclude this week.

I will have Dr. Throndsen execute and forward a signed copy of this agreement to you.

Yours very truly,

(Signed) *Edward J. Reidy*
EDWARD J. REIDY

EJR/fk

---

[1] The correct spelling throughout the letter should be Throndson.

Throndson was not aware of the contents of Reidy's letter until 1965 when his tax returns were audited.

On Monday, December 17, 1962, Alioto telephoned his client and informed him that the "deal had been consummated," and again reiterated the terms. Shortly thereafter Alioto sent Schmitz a copy of Reidy's letter of December 17, 1962.

Alioto instructed Schmitz that he was to deposit $34,000 in escrow with a title company for the purchase of the property and that the three annual payments would begin on January 1, 1963. The three annual installments were to be, and were, evidenced by a note which was secured by a lien on the San Rafael building, which note was delivered to Throndson during 1963.

Reidy, still unaware of the tax consequences, began to prepare a contract for Throndson's signature, including provisions for the respective practices, equipment, accounts receivable, time differential, and the covenant not to compete. He started to write this agreement out in longhand on December 18, writing over the typewritten office copy of his December 17 letter to Alioto. While doing so he telephoned Alioto to discuss the status of the time differential, but Alioto told Reidy that everything had been worked out between the parties and "was fine." Therefore Reidy never completed the work, and no agreement was ever signed by Throndson.

On December 21, 1962, December 11, 1963, and December 18, 1964, Schmitz sent checks for $12,000 each to Alioto with an accompanying letter.[2] The 1962 letter referred to the money as a "covenant payment." Both the 1963 and 1964 letters referred to the money as payments in the matter of "dissolution and settlement."

Alioto forwarded all three checks to Reidy and in his first two accompanying transmittal letters Alioto referred to the payments as being for the covenant. His third and last transmittal letter referred to the $12,000 as the third and final payment in the dissolution and settlement of the partnership. Throndson was not aware of the contents of Alioto's three transmittal letters until shortly before the commencement of this litigation. Reidy forwarded only the checks to Throndson and did not inform him of the contents of the letters. At no time did Reidy refer to the checks as being in payment for a covenant not to compete.

Since January 1, 1963, Schmitz has engaged in the practice of oral surgery at the San Rafael office and Throndson has engaged in the practice of oral surgery at San Francisco. Schmitz, in his income tax return for 1963, deducted the $12,000 paid to Throndson in 1963 as

---

[2] The letter of Dec. 21, 1962, sent to Alioto by Schmitz, contained a check dated Jan. 3, 1963, payable to the order of Throndson. This check was sent to Reidy, Throndson's attorney, by Alioto on Jan. 3, 1963.

payment for a covenant not to compete. Throndson, in his income tax return for 1963, reported $36,000 as a long-term capital gain from the sale of goodwill.

In his notice of deficiency to Schmitz, respondent determined that the amounts paid by Schmitz to Throndson were not allocable to a covenant not to compete and accordingly disallowed the deduction of $12,000 taken on the 1963 return.

In his deficiency notice to Throndson, respondent eliminated the returned long-term capital gain, and increased his income by $36,000 stating that during 1963 he had received a promissory note with a face and fair market value of $36,000 in exchange for Throndson's covenant not to compete.

### OPINION

In these consolidated cases respondent has taken the position of a stakeholder. He does not contend that all deficiencies determined should be sustained in full but contends only that the transaction be treated uniformly as to both parties.

Generally speaking the law regarding the sole issue presented by this case is clear, viz, that amounts (in excess of seller's basis) paid by a purchaser to a seller for goodwill result in capital gain to the seller, with the purchaser acquiring an intangible asset which may not be amortized. This is so because goodwill usually does not have a limited useful life. Sec. 1.167(a)(3), Income Tax Regs.

Amounts paid by a purchaser to a seller for a covenant not to compete are ordinary income to the seller since they are tantamount to payments for services. They may be amortized by the purchaser because covenants not to compete usually have a limited useful life. See sec. 1.167(a)(3), Income Tax Regs.

The threshold question presented to us in this litigation is whether the agreement delineated in Reidy's letter of December 17, 1962, was the actual agreement of dissolution. This depends upon whether Throndson had delegated authority to his attorney, Reidy, to enter into a valid covenant not to compete for him.

Although we believe that the question is a close one, and although the easy solution to this case would be to hold otherwise, we have concluded from the entire record that Throndson created the appearance of ostensible authority in his agent, Reidy, to enter into such a covenant.

Petitioner Throndson refers us to *Nellis* v. *Massey*, 108 Cal. App. 2d 724, 239 P. 2d 509, 512 (1952), wherein it was stated:

Commonly, attorneys are employed by principals in all manner of business transactions and negotiations not involving lawsuits, but it is not the rule that in such situations an attorney has, merely by virtue of his employment as such, plenary authority to enter into contracts on behalf of his client. His function in such matters is that of negotiating for and advising his client. * * *

We recognize the aforesaid quote from *Nellis* v. *Massey* as the general rule. When, however, a principal has led third persons to believe that he has conferred authority upon his agent, he may not deny such authority as against persons who have relied thereon in good faith. Cal. Civ. Code sec. 2317.

In the instant case Throndson introduced Reidy as his attorney in these negotiations with Schmitz and did not indicate that his authority was limited in any way. Throndson permitted Reidy to discuss the terms of prospective agreements with Alioto without informing Alioto or Schmitz of any limitations on Reidy's authority. Throndson was also aware that Reidy was in communication with Alioto by telephone, and permitted Reidy to negotiate the terms of the agreement.

Throndson refers us to *Myers* v. *Stephens*, 233 Cal. App. 2d 104, 43 Cal. Rptr. 420, 429 (1965), wherein it is stated:

Persons dealing with an assumed agent * * * are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority * * *

This quote is inapplicable in the instant case for the same reason that the court in *Myers* v. *Stephens* held it to be inapplicable. In *Myers* v. *Stephens, supra* at 429, as in the instant case, "there was no controversy with respect to the existence of the agency, the controverted issue being the nature and extent of the authority." Contrary to Throndson's argument, *Myers* supports Schmitz' position in the instant case.

In *Myers* the defendants were the president of a development company and a real estate broker who was employed by him. The broker was hired to find a buyer who would purchase and remove a single-unit residence from a plot of land. The plaintiff in *Myers* made an offer to the broker to purchase the residence and move it off the land within 30 to 60 days. The broker informed the plaintiff that he would have to call his principal. The call was made in the presence of the plaintiff, and the president of the development company turned down the offer because he wished to have the residence removed within a shorter time.

After the phone call the plaintiff and the broker discussed the matter further. The plaintiff indicated to the broker that he could have the residence moved within 30 days and that the moving date could be ascertained within 10 days. The broker accepted the offer and gave the plaintiff a receipt. All this was done without the knowledge of the principal, who, on the next day, still uninformed as to the broker's transaction, sold the residence to a third person who had promised to remove it within 15 days.

The plaintiff sued for conversion and the trial court held for him. On appeal, the California District Court of Appeals held that the broker had both actual and ostensible authority, stating (p. 429):

It is defendants' contention that it was incumbent upon plaintiff to inquire into the extent of Erickson's authority. Where the agent acts within the scope of his actual authority, it is immaterial whether or not an inquiry into the extent of the authority has been made by a person dealing with the agent. * * * With regard to ostensible authority, the rule is that, if the principal clothes his agent with such authority, a person dealing with the agent, in the absence of any conduct on the part of either principal or agent warranting inquiry, is entitled to rely upon that apparent authority and is not bound by undisclosed limitations. * * * The rule asserted by defendants that a person who does not determine the extent of the agent's power acts at his own peril * * * does not apply where, by reason of the conduct of the principal, there is no ground for inquiry. * * * The rule contended for by defendants applies to an assumed agency. Persons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it. * * * In the present case there was no controversy with respect to the existence of the agency, the controverted issue being the nature and extent of the authority. * * *

The facts in *Myers* and in the instant case are strikingly similar. In both cases the principal employed an agent to act for him; the agency was established; and the agent performed an unauthorized act unbeknownst to the principal. In *Myers*, as in the instant case, the agent prior to entering into the disputed agreement telephoned his principal. In both cases the opposite parties were aware of the fact of the telephone call and in both cases the agent, subsequent to the telephone call, acted without the knowledge of his principal.

Applying the rationale of the *Myers* case to the facts of the instant case, we find that Reidy had the apparent or ostensible authority to enter into the contract as spelled out in his letter of December 17, 1962.

Petitioner Schmitz urges us to apply the literal terms of the agreement under the rationale of *Commissioner* v. *Danielson*, 378 F. 2d 771 (C.A. 3, 1967), reversing and remanding 44 T.C. 549 (1965), certiorari denied 389 U.S. 858 (1967). Petitioner Throndson urges us instead to disregard the literal terms of the agreement in redetermining the taxes here at issue under a line of cases which support such action when neither the covenant nor the value allocated to it were bargained for, or have any business or economic reality.

Different criteria have been used in the past in determining whether, for tax purposes, the substantive elements of a transaction will control over the literal agreement of the parties. In *Aaron Michaels*, 12 T.C. 17 (1949), this Court utilized the concept of "nonseverability" (from goodwill) of a covenant. See also *Toledo Blade Co.*, 11 T.C. 1079

(1948); *Toledo Newspaper Co.*, 2 T.C. 794 (1943). The companion cases of *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953), and *Commissioner* v. *Gazette Tel. Co.*, 209 F. 2d 926 (C.A. 10, 1954), affirming 19 T.C. 692, recognized and followed the *Michaels* case.

In *Ullman* v. *Commissioner*, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957), the Court of Appeals for the Second Circuit adopted a standard for the degree of proof required to attack the literal terms of an agreement. The *Ullman* court cited *Hamlin's Trust* and stated (p. 308):

> that when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money.

This degree of proof has been labeled the strong-proof rule and has gained general acceptance. *Montesi* v. *Commissioner*, 340 F. 2d 97, 100 (C.A. 6, 1965), affirming 40 T.C. 511 (1963); *Barran* v. *Commissioner*, 334 F. 2d 58, 63–64 (C.A. 5, 1964), affirming 39 T.C. 515 (1962); *Levine* v. *Commissioner*, 324 F. 2d 298, 302 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court. *Schulz* v. *Commissioner*, 294 F. 2d 52 (C.A. 9, 1961), affirming 34 T.C. 235 (1960); *Benjamin Levinson*, 45 T.C. 380, 389 (1966).

An entirely new concept of the degree of proof necessary to overcome the form in which an agreement is cast was enunciated by a divided court in *Commissioner* v. *Danielson, supra*, wherein it was stated (p. 775):

> a party can challenge the tax consequences of his agreement as construed [3] by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * *

Schmitz urges us to adopt this *Danielson* rule (even though it is contrary to the teachings of the Court of Appeals for the Ninth Circuit where this case would go on appeal, i.e., *Schulz* v. *Commissioner, supra*), arguing that to do so would produce an atmosphere of certainty in this often confused area of tax law. We disagree.

To adopt *Danielson*, we believe, would be to endorse a formalistic policy akin to caveat emptor by announcing that this Court will no longer permit the showing of strong proof to realign the lopsided tax consequences produced by an agreement having no rational basis with economic or business reality.

---

[3] We believe the Court of Appeals' use of the word "construed" to mean "construed as originally drawn."

The Supreme Court has on many occasions enunciated the doctrine of substance over form, cf. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945) :

To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

and as we said in *Herman Glazer*, 44 T.C. 541, 545, 546 (1965) :

1. It is firmly established that in applying the revenue laws, we must look to the substance of a transaction rather than to its form unless from an examination of the statute and its purpose form was intended to be determinative. The cases giving effect to this principle are too numerous for useful cataloging here, but the following random selection will give at least some indication as to its broad scope and the wide range of its application. *Knetsch* v. *United States*, 364 U.S. 361; *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 265–267; *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334; *Griffiths* v. *Helvering*, 308 U.S. 355; *Higgins* v. *Smith*, 308 U.S. 473; *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609; *Gregory* v. *Helvering*, 293 U.S. 465. And of particular interest in this controversy are cases applying the foregoing principle in holding that a partner did not in fact sell his partnership interest so as to convert ordinary income into capital gain. E.g., *Trousdale* v. *Commissioner*, 219 F. 2d 563 (C.A. 9), affirming 16 T.C. 1056; *Haggard* v. *Wood*, 298 F. 2d 24 (C.A. 9) ; *Roth* v. *Commissioner*, 321 F. 2d 607 (C.A. 9), affirming 38 T.C. 171.[5] [Footnote omitted.]

We recognize that in many of the above cases the Commissioner was attacking the form of the transaction,[4] but we see no reason why we should make a distinction on this point. To do so here, would be to permit one of the parties to disguise the true nature of the transaction, just as surely as if he had participated in a step transaction. Cf. *Knetsch* v. *United States*, 364 U.S. 361 (1960) ; *Eli D. Goodstein*, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (1959).

We point out that historically, the *Danielson* test of mistake, undue influence, fraud, duress, etc., evolved as an exception to the parol evidence rule in a contest between the parties to a formalized agreement. In such a contest the party seeking to uphold the agreement will often have changed his position in reliance upon its terms and he is therefore entitled to protection, absent evidence of such extreme character as to invalidate the agreement itself and thus render it unenforceable. This historic reason for the rule is never present in a contest between the taxing authority and one of the parties to the questioned agreement.[5] The Commissioner will not have changed his position one iota in reliance on its terms. In the instant case he has described his position as that of a "stakeholder" and asks only that the interpretation of the agreement be consistent as to each of the parties thereto.

---

[4] For examples of successful taxpayer attacks on form see *Helvering* v. *Lazarus & Co.*, 308 U.S. 252, affirming 32 B.T.A. 633; and *Bartels* v. *Birmingham*, 332 U.S. 126.

[5] See *Estate of Leon Holtz*, 38 T.C. 37, 41 ; and *Haverty Realty & Investment Co.*, 3 T.C. 161, 167, and cases cited therein.

In the instant case, unlike *Danielson*, both parties to the agreement are before the Court. We find that the instant case is much closer to the consolidated proceedings in *Schulz* v. *Commissioner*, *supra* (294 F. 2d 52 (C.A. 9, 1961), affirming 34 T.C. 235), where both parties to the agreement were also parties to the tax litigation. Compare *Gazette Telegraph Co.*, 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954), and *Clarence Clark Hamlin Trust*, 19 T.C. 718 (1953), affd. 209 F. 2d 761 (C.A. 10, 1954).

In the proceeding before us the Commissioner was unable to, or at least did not, determine what the legal effect of the agreement was. He therefore determined deficiencies against both parties to protect the revenues, the cases were consolidated, and the Commissioner at trial and on brief has taken the position of a stakeholder, whose only interest is in seeing that the transaction be treated consistently as to both parties. [c]

In *Danielson* only the selling parties to a buy-sell contract were before the Court. The contract contained a covenant not to compete and the Commissioner had determined ordinary-income treatment as to the there-allocated portion of the consideration. The attack of the selling parties was that of substance over form. The majority in *Danielson* attempts to distinguish *Schulz* by stating that in *Schulz* it was the Commissioner, rather than one of the contracting parties, who attacked the form of the transaction. This is inaccurate, however, since in *Schulz*, as in the instant case, the proceeding was consolidated and one of the petitioners did assail the purported agreement.

To follow the majority's distinction to a logical end would mean that the *Danielson* rule should not be applied whenever both contracting parties are before the Court. This would surely create inequities and undue procedural advantages by placing a premium on consolidation. We do not think that such a rule would effectuate uniformity and certainty in the administration and enforcement of Federal revenue acts.

We prefer in the instant case to follow the strong-proof rule of *Ullman* v. *Commissioner*, *supra* (264 F. 2d 305, 308, affirming 29 T.C. 129), wherein it was stated:

when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.

We think that such proof has been adduced in the instant case to demonstrate (and we now hold) that Throndson's covenant was in fact of

---

[c] Neither the consolidation of these cases nor respondent's request for consistent tax treatment of the transaction has any effect on the burden of proof. In each case the burden of proof remains on the respective petitioners to show to the satisfaction of this Court that the respondent's determination is erroneous. *George H. Wilcox*, T.C. Memo. 1968–141.

little or no value to Schmitz, whereas the partnership practice had considerable goodwill that was not otherwise accounted for in determining the value of Throndson's interest.

The partnership had two offices. The office at San Rafael produced a net income of approximately twice that generated by the office at San Francisco. Schmitz made it clear in no uncertain terms that he was going to continue to practice in San Marin County whatever the outcome of the dissolution. Throndson never stated to Schmitz or Alioto that he was going to do likewise, and in fact stated to Reidy that he preferred to practice in San Francisco. There was never any real threat to Schmitz because Throndson made it known, if not expressly, by implication that he would remain in San Francisco and develop the practice there.

Throndson lived in Woodside in San Mateo County, which is approximately 23 miles south of San Francisco and 35 miles south of the San Rafael practice in Marin County. Schmitz on the other hand lived in Kentfield, Marin County, which was close to the San Rafael practice in Marin County.

We believe that Throndson, a man in his late fifty's during the year in issue, was not inclined under any circumstances to travel all the way to San Rafael in order to establish a new practice, and we cannot believe that Schmitz thought otherwise. Under the settlement, Throndson had an existing practice in San Francisco which he would have to abandon, or at least neglect, in order to do so, and Schmitz knew this. Throndson, subsequent to the dissolution, did in fact practice in San Francisco, but not because of the covenant, of which he was unaware.

The practice at San Rafael was dependent upon referrals. Generally patients were referred to the office by a referral slip rather than to a specific doctor. Often patients requiring more than one visit were treated by both doctors on successive visits.

The net profits of the San Rafael practice were approximately twice the amount of those at San Francisco for the years 1958 through 1962 even though that practice had been started in 1953, 7 years after the establishment of the San Francisco partnership practice. These earnings were not attributable to either doctor personally, but to the location of the practice and to the joint efforts of both dentists.

Throndson was not aware of the alleged covenant until 1965, when his income tax return was audited by the Internal Revenue Service, therefore it is clear that he did not knowingly bargain for the consideration assigned to the covenant by the agreement, and it is equally clear that Schmitz was not truly bargaining for any intrinsic worth of the covenant, but was dealing for the value of the San Rafael goodwill, believing that it had been made tax deductible to him by calling it a covenant not to compete. Of significance in this regard is the fact

that the agreement assigned no value at all to the element of goodwill, even though the immediate past history of the net profits from San Rafael demonstrated an excess of about $15,000 a year over the net profits from San Francisco; an excess that would amortize the $36,000, paid in less than 2½ years.

In *Hamlin's Trust* v. *Commissioner, supra* at 765, it is stated:

the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. * * *

The record in the instant case supports Throndson's contention that the parties did not have an understanding of the contract prior to its acceptance by him. Even Schmitz, who was Alioto's client, was not aware until the eleventh hour of what was happening. Schmitz testified:

Q. Did you after that initial meeting authorize Mr. Alioto to represent you in reaching a figure on this particular item?

A. I certainly did.

Q. Did you know at that time that Mr. Alioto was speaking to Mr. Reidy concerning this matter?

A. Yes, I did. He called me on the telephone and he said that it looked as though they had worked out a solution.

Q. And what did Mr. Alioto tell you at that time?

A. Mr. Alioto told me, "The way it looks, you will pay $34,000 for the Throndson's interest in the real property. You will pay $12,000 for three years for a total amount of $36,000 to Dr. Throndson for a covenant not to compete." My response was that I thought this was a lot of money to pay, and he pointed out to me that actually it was a lot of money but that I would have the sole right to practice without competition in Marin County and that furthermore, this was a tax deductible item. I said, "Well, if that is the case, this sounds all right with me. Go ahead and see what you can do as far as contacting Throndson and Reidy and getting a formal agreement."

Taking the record as a whole we find that a covenant not to compete was not discussed between the time that Schmitz indicated that he intended to remain in Marin County, regardless of what happened, and Alioto's phone call to Reidy. Alioto did not explain at any time, either to Reidy or Throndson, the tax consequences of a covenant not to compete. For that matter, Schmitz was not informed of the tax consequence until after the meetings with Reidy and Throndson.

Alioto asked Reidy to prepare the letter of December 17, 1962. When Alioto was asked at the trial as to why he requested Reidy to draft the letter, he stated that it was "a way to getting another lawyer to do your work." We find it difficult to understand that Reidy would have drafted the letter for this reason and we are more inclined to believe that Reidy was under the impression that Alioto needed the letter for financing, as Reidy testified.

The first time that payment was specifically allocated to the covenant was in the letter drafted at Alioto's suggestion, but even there

no definite length of time was set out. We doubt that this demonstrates any arguable relationship with business reality. It is highly unlikely that reasonable men who are genuinely concerned with their economic future would bargain for an agreement allocating all of the excess (over the physical assets) of the purchase price to a covenant with no time limit expressly stated. If Throndson had had any real desire to practice in San Rafael, and if Schmitz had believed there was any real threat that he would (absent a covenant), both men would have insisted upon a definite term for the covenant.

We find, and hold, that the alleged covenant in the letter of December 17 did not reflect the parties true intent with reference to the covenant or have any relationship to its true economic value.

Schmitz refers us to Rev. Rul. 57–480, 1957–2 C.B. 47, and endeavors to characterize Reidy's understanding of the $12,000 a year as ordinary income under anticipatory assignment of income principles. See *Lucas* v. *Earl*, 281 U.S. 111 (1930) ; *Harrison* v. *Schaffner*, 312 U.S. 579 (1941).

We find Schmitz' contention wholly inapplicable. In Rev. Rul. 57–480, *supra*, it is stated that ordinary income will be recognized "if the seller retains a right to any fees or revenue collected for services performed at any time after the sale, or the purchaser agrees to pay an amount equal to any part of such fees or revenue * * *."

In the present case the seller, Throndson, retained no right to future income or revenue and Schmitz certainly did not agree to pay Throndson any amount equal to any part of such future income.

Schmitz also argues that Throndson was paid for his personal skill in the practice of oral surgery. Throndson, on the other hand, takes the position that he sold his interest in the San Rafael practice which had experienced exceptional growth and success; that had with an equivalent amount of effort and a much shorter time span generated approximately twice the amount of earnings as the practice at San Francisco; and that the excess of the selling price over the physical assets represented his interest in this extraordinary growth. We think Schmitz' contentions belie the facts of the instant case. We agree with Throndson.

In *Rodney B. Horton*, 13 T.C. 143 (1949), we quoted Lord Eldon in *Cruttwell* v. *Lye*, 17 Vesey 335, and stated:

The "good will" which has been the subject of sale is nothing more than the probability that the old customers will resort to the old place. "Good will" has been defined as "all that good disposition which customers entertain towards the house of business, identified by the particular name or firm, and which may induce them to continue giving their custom to it." * * * That it is property is abundantly settled by authority. * * *

Further, in the case of *Malcolm J. Watson*, 35 T.C. 203, 213 (1960), we stated:

It has also been said that goodwill, viewed from a transferee's standpoint, is an opportunity to succeed to the advantageous position of his predecessor. Generally, attitudes of customers or others may be transferred from one proprietor to another (1) by furnishing the transferee with all the symbols and other transferable attractions which invoke a favorable response in the customers and (2) by removing the transferor as an alternative attraction. * * *

These indicia are found in the instant case.

The petitioners in this proceeding built up a profitable oral surgery practice in San Rafael. Both doctors made substantial efforts to build up the practice and to establish a system of referrals. Referral slips were printed up for the convenience of other physicians and dentists. The entire practice was dependent upon referrals. The patients almost always were referred to the office of the partnership rather than to either doctor individually.

On the basis of the record as a whole, we conclude that the $36,000 ostensibly paid for a covenant not to compete was in reality attributable to Throndson's interest in the goodwill established at the San Rafael practice in Marin County. Furthermore, even if we had concluded that a realistic allocation could have been made as between goodwill and a covenant, neither the evidence presented nor the parties suggest how it might be done.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

RAUM, HOYT, IRWIN, and STERRETT, *JJ.*, concur in the result.

---

FAY, *J.*, concurring: I agree with the result reached by the majority. However, I think it is not necessary to take a position one way or another with respect to *Danielson*. That case is distinguishable from the case at bar.

---

DRENNEN, *J.*, dissenting: I respectfully dissent, for two reasons. First, I do not believe the record in this case justifies ignoring for tax purposes the specific terms of the agreement here involved even under the so-called strong-proof standard used by the majority. In *Ullman v. Commissioner*, 264 F. 2d 305, frequently relied upon by this Court and the majority here, it was stated:

when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.

Such is the situation here.

In support of its conclusion that the degree of proof required to overcome the specific declarations of the parties has been provided by

Throndson in this case, the majority relies primarily on evidence indicating that Throndson personally was not aware of the covenant not to compete and did not bargain therefor, that it was unlikely, for various reasons, that Throndson would set up a competitive practice in San Rafael, that Schmitz' attorney implied to Throndson's attorney that the reason for the covenant not to compete was to assist Schmitz in financing the transaction, and that neither Throndson nor his attorney understood the tax implications of the covenant not to compete. On the other hand, it seems clear that both of the parties to the agreement were represented by counsel, who presumably acted within their authority in agreeing on the terms of the contract, and that both attorneys knew that a covenant not to compete was included in the agreement and the value that was being allocated to it. The fact that Throndson personally did not bargain for the covenant not to compete is immaterial if his attorney was acting within his authority in doing so.

While there may have been goodwill attached to the San Rafael practice, that goodwill presumably had been established by both of the partners but it would be of little value to Schmitz unless Throndson specifically agreed not to set up a competing practice. It is evident that Throndson had some idea of the value of a noncompetitive agreement when he offered to sell the San Rafael business to Schmitz for $90,000 but was only willing to pay Schmitz $50,000 for the San Rafael practice because Schmitz was going to continue in practice in San Rafael in any event. It further appears evident that in all probability Schmitz finally agreed to pay $70,000 for the San Rafael practice only because of the protection, combined with the tax advantage, that it gave him. The covenant can hardly be said to be lacking in economic or business reality.

It seems to me that the real reason for the conclusion of the majority is to avoid what it considers to be the lopsided tax consequences of allocating the entire $36,000 to the covenant not to compete. However, the conclusion it reaches gives a lopsided tax advantage to the party who failed to protect his interest in arm's-length bargaining, to the tax disadvantage of the party who did protect himself and possibly paid a part of the purchase price for the tax advantage. The Commissioner is a stakeholder here and as between the parties I would require much stronger proof than has been presented here to permit either party to disavow the covenant not to compete and the value assigned thereto, which the attorneys admittedly agreed upon. To do otherwise seems to me to sap all the strength out of the strong-proof rule and in doing so to produce an unreasonable and inequitable result.

My second reason for disagreeing with the majority opinion is that I see no reason for the Court in this case to specifically accept

or reject the degree-of-proof standard enunciated by the Court of Appeals for the Third Circuit in reversing this Court in *Commissioner* v. *Danielson*, 378 F. 2d 771. The instant case arose in the Ninth Circuit, and the Court of Appeals for that circuit appears to apply the strong-proof rule of the *Ullman* case in deciding issues such as we have here, *Schulz* v. *Commissioner*, 294 F. 2d 52, just as this Court has done in the past. It would be no departure from the precedents of either this Court or the Court of Appeals for the Ninth Circuit, to which this case most likely will go if appealed, to use the strong-proof standard; so I see no reason why this Court should not decide this case on the basis of the strong-proof rule and wait until we must decide a case arising in the Third Circuit before we take issue with the Court of Appeals for that circuit on the proper standard to be used in such cases.

Moreover, in *Commissioner* v. *Danielson*, *supra* at 775, the Court of Appeals stated:

a party can challenge the tax consequences of his agreement *as construed by the Commissioner* only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [Emphasis supplied.]

Here the Commissioner has taken no position as to the proper construction of the agreement between the parties; he simply takes the position that it should be applied consistently with respect to both parties. Only the sellers were before the Court in *Danielson*. We cannot be certain what standard the Court of Appeals for the Third Circuit would use where the dispute is between the parties.

For the above reasons I do not believe it is necessary for this Court to specifically reject the standard announced by the Third Circuit in *Danielson* in deciding this case, and I would not do so.

TIETJENS and TANNENWALD, *JJ.*, agree with this dissent.